DUCKWORTH v. THOMPSON et ux.

No. 1255—5640.

Commission of Appeals of Texas, Section B.

April 1, 1931.

T. R. Mears, of Gatesville, for plaintiff in error.

Hugh J. Cureton and J. P. Word, both of Meridian, for defendants in error.

LEDDY, J.

We adopt the following clear and succinct statement of the case made by the Court of Civil Appeals, 22 S.W.(2d) 528, 529, viz.:

"This is an appeal from the judgment of the district court in a habeas corpus proceeding, instituted by appellant, O. D. Duckworth, against appellees, J. O. Thompson and wife, Bertie Thompson, to recover control and custody of L. D. Duckworth, a minor son of appellant.

"L. D. Duckworth was eight years old at the time of trial. He was delivered prematurely by an operation in a futile attempt to save his mother's life. She died within an hour after his birth. Mrs. Thompson, one of the appellees herein, at the request of his father, and with the approval of his relatives, took charge of him about an hour after his birth, and has had charge of him, and has tenderly cared for him ever since. She and the child's mother were sisters. He was a delicate child from the beginning, and was carried on a pillow for five months. For about three months his condition required constant attention all through the night. Mrs. Thompson had the sole care of him during such time. Her husband and son frequently did the housework so that her entire time and energy could be devoted to his care. He is still delicate in health and of a timid disposition. He is devotedly attached to his foster parents, especially his foster mother. A physician testified that the sundering of such associations and the tender ties of affection existing between said child and Mrs. Thompson would be very detrimental to him in his then state of health.

"Appellant married a second wife about four years before the trial. She was a sister of appellee Thompson, and had made her home with him. Cordial relations existed between appellant and his wife and appellees until a misunderstanding arose over the fact that appellee Thompson enrolled said child on the scholastic census under the surname of Thompson instead of Duckworth. Some hasty words were exchanged between appellant and Thompson about the matter, and shortly thereafter this suit was instituted. Prior to that time appellant occasionally visited the home of appellees, and incidentally enjoyed association with his child. There is no testimony that appellant exhibited any special affection for him during said time. Except for a small doctor's bill and one or two other small sums aggregating approximately $100, appellees have maintained said child the entire time at their own expense.

"Mrs. Thompson lavishes maternal affection upon said child. The year preceding the trial was his first within scholastic age. He was too delicate to attend school with anything like regularity, but she procured books and taught him at home so that his teacher testified he was up with his class. Mr. Henshaw, the child's maternal grandfather, testified that he advised appellant at the time of the child's birth to give it to Mrs. Thompson to rear, and told him, that if he did that, he must never take it away from her, because it would be like her own, and that appellant said, 'Henshaw, upon my honor I will never take it from her.' Mrs. Thompson testified that she accepted the care of said child an hour or two after his birth; that about two days later she and appellant named him together for his mother and father, and that appellant told her at that time to take the baby, and raise him up, and that he gave him to her 'for always.' Another witness testified that appellant so stated while on the way to the burial of the child's mother. Appellant denied said statements in toto. There are some other conflicts in the testimony, but they must all be considered as resolved against appellant by the verdict of the jury and the judgment of the court. Appellees reside near Kopperl, about 40 miles from Valley Mills, where appellant resides. It would be more convenient for the child to attend school from his father's home than from the home of appellees, but appellees provided a way for him to ride to and fro when he was able to attend school during the preceding year, and expressed their willingness to continue to do so. Appellees admitted in open court that the general reputation of appellant and his wife in the community in which they lived for being nice, honorable, upright, respectable, and law-abiding citizens was good. The testimony showed without contradiction that appellees also possessed such high reputation, and, in effect, that either family would afford a suitable home for the child. Other matters of relative advantage or disadvantage in reference to the respective homes must also be considered solved in favor of appellees by the verdict and judgment.

"The testimony disclosed that the child had learned that appellant was seeking to remove him from the only home he had ever known and from those who had loved and cared for him all his life, and whom he had learned to love in return, and to take him to appellant's own home, and that he became greatly alarmed at the prospect. He qualified as a witness to the satisfaction of the court, and testified in the case without challenge of his

competency as a witness by appellant. He testified that appellees had always been good to him; that he loved them 'a whole lot'; and that he wanted to continue to stay with them. He further testified that he had been told by appellees to love his father and be nice to him when he came to see him, but that he did not want to go and live with him, but desired to remain with appellees. He further testified that at that time in the courtroom he did not want to go and sit in his father's lap nor hug him. Appellees testified that appellant and his wife were welcome at their home, and that they could come and visit the child there whenever they chose, and that they bore no ill will on account of this suit."

■ The father is the natural guardian of his child. The law will not permit him to enter into a binding contract, the effect of which is to release him from the duties incidental to such relationship. Occasionally, from necessity or other reasons, a parent voluntarily surrenders the custody and possession of his child to another and permits such person to assume the attitude of a parent through a long period of the impressionable years of the child's life. When this is done, a relation is established which, if permitted to continue for a sufficient length of time, is reasonably calculated to foster and develop new affections in the heart of the child toward those who assume its guardianship. By reason of such relation, the influence of the foster parent often becomes a vital and dynamic force for properly moulding and fashioning the life and character of the child during its minority. Deprived by its natural guardian of the intimate association incident to parent and child, the influence capable of being exerted by such parent upon the future life of the child may be materially impaired, if not altogether destroyed.

When a new and powerful influence of this nature has thus been developed in foster parents which may be extremely beneficial to the child's future welfare, and the natural parent seeks the aid of a court of equity to restore to him the custody of his child, he is asking for the destruction of a relation created by his own voluntary act. In the very nature of things it must be realized that a compliance with the parent's request may have, in many instances, a very injurious effect upon the future of the child. Where a court is faced with the dilemma on the one hand of a father asserting his natural right to the custody of a child, and on the other by the foster parent contending that the ties and affections created by the new relation are such it will be extremely detrimental to the child's future welfare for them to be disturbed, by what rule or criterion should a court solve the perplexing question thus presented?

The answer suggested by counsel for plaintiff in error is that the natural parent is entitled as a matter of law to the custody of the child unless his positive disqualification as a suitable person for such purpose is satisfactorily established by the foster parent.

Defendant in error's counsel would apply a different rule. They assert that the welfare of the child is the paramount and dominant issue, and that, where the foster parents have met the burden of proof in establishing by satisfactory evidence the interest of the child would be best subserved by continuing its custody with them, the court should recognize the welfare of the child as paramount and refuse to disturb the existing relation.

■ The Supreme Court of this state has answered this question in Legate v. Legate, 87 Tex. 248, 28 S.W. 281, 283, by announcing the rule and guide for trial courts in such cases. It is there asserted that the natural parent is entitled to the custody of a child unless it appears by satisfactory evidence its best interests demand that such parent should be deprived of that custody, and upon the person asserting such fact devolves the burden of proof.

■ In that case Judge Denman, speaking for the court, lays down the doctrine, which is supported by the highest considerations of humanity and public policy, that the interest of the child is the paramount question to be determined. He makes this admirable statement of the criterion to be followed in such cases: "Two homes are thus offered the child, who is in no wise responsible for this unfortunate controversy, and has not sufficient discretion to select. We hold, as a matter of law, that it is entitled to the benefit of that home and environments which will probably best promote the interest of the infant. The question as to whose custody will be most beneficial to the infant is one of fact, of which this court has no jurisdiction, but which is to be determined in the first instance by the district court, upon hearing all the evidence tending to shed any light upon these two homes, and the people inhabiting them, including their entire connection with, affection for, and present and future ability to care and provide for this little girl, in order that the court may be enabled to determine, upon the whole case, the difficult question of the fact above stated."

The rule laid down in the above case has been followed in numerous decisions by the Courts of Civil Appeals. Fasel v. Gunning, 249 S. W. 875; Taylor v. McGee, 254 S. W. 155; Sanchez v. Garcia, 278 S. W. 868; Smith v. Long, 181 S. W. 478; Dunn v. Jackson (Tex. Com. App.) 231 S. W. 351; Miller v. Banks, 280 S. W. 301; Zephyr v. Miller, 14 S.W.(2d) 915; Kendall v. Williams, 233 S. W. 296.

However, in some cases, Courts of Civil Appeals have applied a rule at variance with that given in the Legate Case. Sears v. Davis, 19 S.W.(2d) 159; Reeves v. Tunnell, 21

734

S.W.(2d) 365; Carter v. Lambert, 214 S. W. 566. These cases seem to be predicated upon the proposition that the effect of the decision of the Supreme Court in State v. Deaton, 93 Tex. 243, 54 S. W. 901, 903, was to modify the rule laid down in Legate v. Legate, supra.

We think the Deaton Case, when properly analyzed, is not only not susceptible of the construction that it was intended to modify the rule in Legate v. Legate, but that the effect of said opinion is to reaffirm such rule. Judge Brown, speaking for the court in the Deaton Case, used the following quotation from Weir v. Marley, 99 Mo. 484, 12 S. W. 798, 6 L. R. A. 672: "What is for the best interest of the infant? is the question upon which all cases turn at last, whatever may be said in the opinion about contracts; and the answer returned is that the custody of the child is by law with the father, unless it appears by satisfactory evidence that the best interest of the child demands that he should be deprived of that custody, and upon him who so avers devolves the burden of proof."

After quoting the above, this eminent jurist refers to the fact that the case from which it is taken was cited by the court to support the conclusion reached in Legate v. Legate. He then states, in language too clear to admit of controversy as to its meaning, that trial courts in this character of cases should be governed by the rule as thus announced. As to the rule to be applied, he says: "The rule which should guide the court is aptly expressed in the case of Weir v. Marley, which we have quoted."

After prescribing this test for the guidance of trial courts, he observes that it is supported by the case of State v. Richardson, 40 N. H. 275, from which he also makes a quotation. It is from the excerpt quoted from the opinion of the New Hampshire court that some of the Courts of Civil Appeals have drawn the conclusion there was thereby indicated an intention to modify the rule announced in Legate v. Legate so as to deny the foster parent the custody of a child unless he is able to establish to the satisfaction of the court that the parent is, because of some disqualification, not a suitable person to have the custody of his child. Certainly a jurist as able as the lamented Justice Brown would not lay down in specific terms a rule for the determination of this question, and at the same time have intended that what was said in the opinion by the New Hampshire court, from which quotation was made, should have the effect of modifying the specific instruction given by him for the guidance of trial courts. The question before the court in the Deaton Case was one as to the burden of proof, and the quotation from the New Hampshire court was no doubt made by the court as sustaining its views upon that particular question, as it did, and was certainly not intended to have the ef-

fect of contradicting the direct holding which the court in its own language had just made.

It is also insisted by plaintiff in error that the Commission of Appeals has announced the rule in this character of cases contrary to that expressed in the Legate Case. The cases of Greenlaw v. Dilworth, 299 S. W. 875, 881, Castro v. Castellanos, 294 S. W. 525, 526, and Edwards v. Edwards, 295 S. W. 581, the last two cases being by this section of the Commission, are cited as instances where the rule applied was different from that in the Legate Case.

An expression used by Judge Nickels in the first-named case is cited to show that the rule was intended to be modified so as to make the natural parent's right to the custody of his child absolute unless a positive disqualification should be established by the foster parent. The statement relied upon as modifying the rule is the following language: "But the presumptions noticed mean that in general the child's welfare and the parent's fitness commonly rest in the natural relation which may not be disturbed save by that rebuttal which exhibits positive disqualification of the parent."

It will be seen that Judge Nickels does not go to the extent of saying that in all cases there must be shown a positive disqualification of the parent in order to deny his right to the custody of his child. The observation is merely made that "in general" the child's welfare rests in the relation that may not be disturbed save by proof of the positive disqualification of the parent. This statement is not a contradiction of the rule that the final test is the welfare of the child, as it may be that generally the natural ties between a parent and child are such that the parent's rights should prevail. Again, the expression used must be construed in the light of the facts involved in the case which was under consideration. It was one where each of the parties claiming the right to the custody of the child was asserting the positive moral disqualification of the other as a suitable person to have the custody. The language used therefore had application to that particular state of facts, and manifestly was not designed by the author of the opinion to modify the rule announced by the Supreme Court in Legate v. Legate, and reaffirmed by it in State v. Deaton, as both of these cases are cited by Judge Nickels as giving the proper criterion for the courts in determining the custody of a child.

Nor is the holding made by this Commission in Edwards v. Edwards, 295 S. W. 581, out of line with the test declared in the Legate Case. Judge Powell in that case refers to the Deaton Case as embodying the correct standard and also expressly reaffirms the holding of this Commission in Castro v. Cas-

tellanos, made but a short time previously when it was composed of the same judges. The last-named case quotes with approval from the Legate Case and applies the exact rule announced therein as a guide to the trial court upon a retrial of the case. Presiding Judge Short, delivering the opinion for this Commission in said case, held that the father had the prima facie right to the custody of the child; the burden being upon the foster parents to overturn such prima facie right by testimony "showing the unfitness of the plaintiff in error, or his incapacity, or any other conditions, the legal effect of which would be to demonstrate that the best interests of the child would be served by giving them its custody."

While the defendant in error was not entitled as a matter of right to a jury trial [Burckhalter v. Conyer (Tex. Com. App.) 9 S.W.(2d) 1029; Pittman v. Byars, 51 Tex. Civ. App. 83, 112 S. W. 102], it was well within the authority of the trial court to impanel a jury and require it to make a finding which might be used by the court in an advisory way. There was but one issue submitted to the jury, which was as follows: "Taking into consideration only the best interest of the minor child, L. D. Duckworth, answer whether said minor child should be left in the care and custody of the defendants, J. O. Thompson and wife, Bertie Thompson, or should be given into the custody and care of the plaintiff, O. D. Duckworth."

The court in its judgment approved this finding and made an additional one that it was deemed for the best interests of the child it remain with the foster parents, and the Court of Civil Appeals has determined that such finding is justified by the evidence.

It is indeed most regrettable that a situation has been created which results in depriving a father of the custody of his own child. However, the unfortunate predicament in which the father now finds himself is due solely to his own voluntary act in surrendering to another the custody of his infant child for the first eight years of its life. It appears that at the time of the birth of the child the father maintained a home and lived with his daughter, who was then about 17 years of age. At no time did he take the child into his own home, being content for it to remain in the custody of his deceased wife's sister. The child was a very delicate one, requiring the most constant and tender care. For the first five months after its birth it was necessary for it to be handled upon a pillow. It is not disputed that the good woman who, at the request of the father, assumed the responsibility of caring for this motherless infant, spent eight years of her life in ministering unto it and in doing everything for its welfare which a mother could have done. The Court

of Civil Appeals is in error in stating that the father remarried some four years after the death of the child's mother, as this marriage occurred about seventeen months thereafter, and continuously from that time he maintained a home which was admittedly a suitable one for the child. Notwithstanding this fact, he made no effort to assume its custody, but continued to permit it to remain with the foster mother until at the time of the trial it had reached the age of 8 years. This long and intimate association between the child and foster mother, during the most plastic period of the child's life, coupled with the many sacrifices necessarily made by the foster mother for its comfort and well being, has resulted in the creation of bonds of affection between them which do not now, and even if the father were given custody of the child, would in all probability never, exist between the father and child.

The trial court, in view of all the circumstances shown in evidence, has concluded that the influence of the foster mother in the remaining portion of this little boy's minority will be more potent in fitting him for the duties and responsibilities of citizenship than would the influence of the father. This court would not be disposed, even if it had the authority, to disturb that conclusion.

We recommend that the judgment of the Court of Civil Appeals be affirmed.

CURETON, C. J.

The judgment of the Court of Civil Appeals is affirmed, as recommended by the Commission of Appeals.