John Dell COOPER, Appellant,

v.

TEXAS DEPARTMENT OF HUMAN
RESOURCES, Appellee.

No. 14256.

Court of Appeals of Texas,
Austin.

May 29, 1985.

Rehearing Denied June 19, 1985.

Bradley Miles, San Angelo, for appellant.

Dick Alcala, Dist. Atty., Daniel Edwards, Asst. Dist. Atty., San Angelo, for appellee.

Before SHANNON, C.J., and EARL W. SMITH and BRADY, JJ.

SHANNON, Chief Justice.

This appeal concerns the appointment of a managing conservator pursuant to Tex. Fam.Code Ann. § 14.01 (1975).

Appellant John Dell Cooper filed suit in the district court of Tom Green County seeking a divorce from Marilyn Ruth Cooper. By his suit, John also sought appointment as managing conservator of their four children and a division of the community property. Marilyn likewise sought appointment as managing conservator and an order requiring John to make child support payments.

Upon trial to the court, the district court rendered judgment granting the divorce and dividing the community property. The court appointed neither John nor Marilyn as managing conservator, but instead appointed the Texas Department of Human Resources. Only John has perfected an appeal from the district court's judgment. This Court will reverse the judgment.

John does not question that part of the judgment ordering the divorce and dividing the community property. Instead, he attacks the judgment upon the basis that the district court abused its discretion in appointing the Texas Department of Human Resources as managing conservator of the children.

The four children are: John Dell, Jr., age nine; Tiffanie Diane, age eight; Tonya Nicole, age four; and Kara Miranda, age one and a half. Kara suffers from defects affecting her eyes, facial muscles and one hand. She has been treated for her condition and she will require treatment in the future.

The natural right between parents and their children is one of constitutional dimensions and should be disturbed only for the most compelling and serious of reasons. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In Interest of G.M.*, 596 S.W.2d 846 (Tex. 1980); *Wiley v. Spratlan*, 543 S.W.2d 349 (Tex.1976). It is presumed that the interests of young children are best served by naming their natural parent as managing conservator. *Mumma v. Aguirre*, 364 S.W.2d 220 (Tex.1963). As a result, a natural parent will be appointed managing conservator unless the court concludes that the appointment of the parent would not be in the best interest of the child. Tex.Fam. Code § 14.01(b). The party seeking to bar a natural parent from appointment to managing conservatorship has the burden to show that the best interest of the child would instead be served by the appointment of the non-parent. *Herrera v. Herrera*, 409 S.W.2d 395 (Tex.1966); *See Duckworth v. Thompson*, 37 S.W.2d 731 (Tex. Comm.App.1931, judgmt. adopted).

Accordingly, the burden of the Texas Department of Human Resources was twofold: to demonstrate that (1) the best interests of the children *would not* be served by the appointment of their father as managing conservator and (2) the best interests of the children *would* be served by the appointment of itself as managing conservator. By rendition of the judgment, the district court necessarily concluded that the Department discharged those burdens. This Court does not agree.

The Department failed to prove that it was not in the best interests of the children for their father to be appointed managing conservator. John Cooper is twenty-eight. He lives with his mother and step-father, Mary and Clem Clutter, in Ruidoso, New Mexico, when he is not in Saudi Arabia working for an energy company. The terms of his employment contract require him to work abroad for thirty-five consecutive days and then permit him to return to this country for thirty-five days on his own

time. Although John has little formal education, he presently earns $48,000 annually.

John's marital troubles stretched out for more than a year before the divorce. His former wife, Marilyn, suffers from a mental disturbance and has been in and out of the mental hospital in Big Spring. As the marriage was coming apart, it is clear that John assumed responsibility for the care of the children. With respect to the handicapped child, Kara, it is undisputed that John, solely, cared for her needs. Kara's physician, Everett A. Moody, summarized how John Cooper had discharged his responsibility in caring for Kara:

> In spite of the fact that her father works overseas a large percentage of the time, he has always been the one who has seen to Kara's care and brings her in personally. He has always done everything we've asked him to do. He is one of the most devoted and committed parents I've ever met.

On deposition and in response to a question whether John had tended to the medical needs of Kara, Dr. Moody replied:

> He certainly has; he's been faithful in keeping his appointments and enthusiastic about expressing an interest in her needs. He is, in fact, one of the most eager, attentive fathers I can recall.

A San Angelo neighbor, Dennis Deviney, testified that he had lived next door to the Coopers since September of 1979. During those years, Deviney never saw or heard John mistreat the children nor did he see bruises on any of the children. Deviney described John's relationship with the children as normal. He further stated that when John was out of the country, the children were unsupervised and uncontrolled; they would be outside the house until late at night and would be improperly clothed in the winter. When John was home, the children would be properly dressed and well behaved. Deviney stated that one could tell when Cooper had returned from Saudi Arabia, without seeing him, by the way the children were dressed and by their behavior.

Rita Casey, a foster mother of the three eldest children for several months, testified that John was a good playmate with the children and seemed to be a loving father. The children appeared to love their father and were not afraid of him. Mrs. Casey never saw John mistreat any of the children in the two or three times that she saw him with the children.

The dissenting justice selects a scrap from Mrs. Casey's testimony and advances it as supportive of his thesis that it would not be in the best interests of the children for their father to be appointed managing conservator: "Finally, appellant's own witness, a woman who cared for the children for four months, remarked that she wouldn't want either parent to be her kid's parents."

The context of Mrs. Casey's remark bears examination. When the Department placed the Cooper children with Mrs. Casey, they misbehaved badly. Their misbehavior was encouraged by daily calls from Marilyn telling them that they did not have to mind the "stranger" (Mrs. Casey). The children's lack of discipline and manners, rooted in the absence of supervision when their father was abroad, prompted Mrs. Casey's remark. As indicated by a review of all of Mrs. Casey's testimony, she mistakenly attributed the children's bad behavior to a lack of discipline by both parents.

John Cooper impressed social worker Jan Bennett as a happy, well-adjusted man who found pleasure in being helpful and busy. Although he can barely read, he is mechanically inclined and can dismantle and reassemble almost anything. John claimed that he sets goals for himself and tries to attain them. He described himself as a "doer" and that he and the Clutters enjoy physical things such as hiking, chopping wood and fixing cars.

As transcribed by social worker Bennett, John Cooper assessed his goals for his children as follows:

> John states that he hopes his children will all get a good education. He feels that with a good upbringing which he is eager to provide the children, that a child

should be ready to make their own decisions at age 13. That is to say their values are formed, their goals are taking shape and they have a mind of their own. As a parent, guidance, advice and assistance would be available, but not forced.

On the other hand, Betty Ann Seiler, the other social worker from New Mexico, emphasized that John enjoyed talking about himself and showed her things about the house which he had made. Seiler described John's hopes as being all "very flowery." She noted that he has a poor vocabulary and mispronounces many "big words" which he attempts to use. Beyond such comments, there was nothing negative which bore on John's ability as a parent.

At the suggestion of the New Mexico Department of Human Services, John has begun attending parental counseling classes in Ruidoso when he is in this country.

The most unfavorable evidence reflecting upon John Cooper's parental abilities centered upon several occasions when he meted out harsh punishment upon the children. Mike Harper, John's co-worker, testified that he had known the Coopers for four years. He related that approximately two and one-half years before the hearing, he saw John hit John, Jr. in the face with a closed fist, knocking the boy down. This incident, however, was the only one which he observed in the four years that he had known the family. John's father-in-law, Laddie Batla, testified that he once saw John spank John, Jr. with a wooden paddle. On another occasion, Batla saw the father slap John, Jr. hard. Pam George, Marilyn's friend, once saw John take Tiffanie into another room with a wooden paddle, and heard him spank her. As might be expected, Tiffanie cried and had resulting red marks on her legs.

Tonya, nearly four years old, had bruises on her thighs during the June 27, 1983 hearing on temporary managing conservatorship. Both John and Marilyn agreed that Tonya had been in John's care for the several weeks before the hearing, but that John had delivered the children to Marilyn the day before the hearing. It is undisputed that the children had been with Marilyn for approximately sixteen hours before the hearing. John and Marilyn each accused the other of inflicting the bruises. Tonya told social worker Debra Price that her father had spanked her, causing the bruises.

Debra Price, the social worker for the Texas Department of Human Resources, prepared a report which she filed with the district court in 1983. In preparing the report, Price interviewed Marilyn, the Cooper children, and others. She did not interview John Cooper nor Mary and Clem Clutter. Marilyn recited to Price that John spanked the children with his hand or a paddle, often leaving bruises. The children verified that their father spanked them hard.

Another episode which should be noted is that Tonya in March of 1983 had a large patch of hair pulled from her head. It is not certain with whom the child was staying when the hair was pulled out. John testified that Tonya told him that she, herself, pulled out the hair. Rita Casey, the foster mother who had custody of the three eldest children from September 6, 1983 to about one week before the February 8, 1984 hearing, testified that Tonya told her that she pulled it out herself. Debra Price stated in her report, dated August 31, 1983, that Tonya told her that her aunt Terry Lynn pulled out the hair. Finally, Marilyn testified that Tonya was living with Brian and Grace Cooper in Fort Davis when the hair was pulled out. No one claimed that John Cooper had pulled out the hair.

■ Admittedly, John's punishment of the children appears overly spartan. Nevertheless, the evidence is that such punishments occurred only infrequently and only in response to the childrens' *need* for discipline. As John was abroad one-half of the time and as the children were basically unsupervised and uncontrolled by Marilyn, they doubtless stood in need of fairly rigorous discipline. Custody should not be denied a natural parent because there is disagreement concerning the prop-

er method of punishment for breaches of family rules of conduct unless the punishment sinks to the level of unwarranted physical abuse.

■ Ordinarily, managing conservatorship is denied the natural parent predicated upon such evidence as physical abuse, severe neglect, abandonment, drug or alcoholic abuse or very immoral behavior on the part of the parent. There is no suggestion of such evidence in this record.

■ The Department of Human Resources failed entirely to discharge its second burden, that the best interests of the children would be served by its appointment as managing conservator. The dissenting opinion makes no effort to address the Department's failure to discharge its second burden. As neither the Texas Department of Human Resources nor the father was in the position to personally care for the children on a day-to-day basis, the district court heard evidence concerning the respective plans of each for the care of the children. Pursuant to previous temporary orders of the court, the Texas Department of Human Resources had been appointed temporary managing conservator. In the exercise of that office, the children had been placed in "foster care." Texas Department of Human Resources' social worker, Debra Price, testified that in the event the Texas Department of Human Resources was appointed managing conservator, the Cooper children would not be returned to "foster care." Instead the Department's plan was to place the children in the home of their uncle and aunt, Brian and Grace Cooper of Fort Davis. Social worker Price had never visited Brian and Grace in their home in Fort Davis nor had she met them. She testified, however, that she had spoken to Grace several times by telephone.

Neither Brian nor Grace appeared and testified. Debra Price testified that an Alpine social worker prepared a "home study on Brian and Grace Cooper." According to Price, that home study was "highly favorable." Unfortunately, however, that home study was not filed with the district court,

contrary to Price's testimony, and, of course, is not here available for examination by this Court.

The references to Brian and Grace, which do appear in the statement of facts, do not reflect favorably upon them as suitable persons to care for their nephew and nieces. Brian and Grace have three children of their own and live in Fort Davis in an already crowded two-room house containing about nine hundred square feet. There are two beds in the house. Grace was described by her sister-in-law, Marilyn, as "quick-tempered" and "very sharp, blunt." At least one aspect of the mode of their life may be indicated by the fact that when their first baby was about a month old, Brian and Grace hitchhiked from Fort Davis, in winter time, to San Angelo for a visit. Grace reportedly would dress her children for bed as early as three o'clock in the afternoon so that she would be ready to go out at night. One witness, Pam George, who had known Grace for years, described her as "very strange" and "quick tempered." That witness would "definitely not" leave her own children with Grace. This brief summary is all of the evidence that the record contains supporting the plan of the Texas Department of Human Resources for the future care of the Cooper children.

To the contrary, John Cooper's plan for the future care of his children is set out in full detail. His mother and step-father, Mary and Clem Clutter, have agreed to care for the children in their home in Ruidoso. Mary would have the primary responsibility for the day-to-day care of the children when her son was abroad in Saudi Arabia. The children lived with the Clutters from February 1983 to June 1983. Mary operates a pet shop out of her home which is located on a large trailer park owned by the Clutters. She had planned originally to hire someone to watch the grandchildren when they were not in school and when she had to be in the pet shop, but she later decided to hire someone to look after the shop, and Mary, herself, will look after the children. On cross-examination,

Marilyn's attorney attempted to establish that Mary was a harsh disciplinarian who severely punished her own children, thereby implying that she would do the same to her grandchildren. Mary admitted giving her own children a hard spanking, but only after serious misconduct; for example, when Terry Lynn, her daughter, shop-lifted something, or when Brian, her son, stole a motorcycle and was shot at by the San Angelo police. (Brian, of course, is the uncle with whom the Department plans to place the Cooper children).

Pam George, a young woman who grew up around Mary's children, described Mary as short-tempered. She claimed that twelve years before, after Terry stole something, Mary stripped her and whipped her with a belt. George also stated that ten years before, Mary repeatedly slapped John when she was teaching him how to read and he would stumble over words. She further claimed that Mary once chased Brian with a hoe when he did something to anger her. It should be kept in mind that George was called by Marilyn, who of course, was seeking appointment as managing conservator.

The Clutters' house was described by Jan Bennett, a social worker from New Mexico, as "very spacious and nicely furnished." Mary Clutter was described as organized and productive, and having very set ideas about her way of life. Clem Clutter is a seventy-two year old man who appeared "easy going" with a "quick sense of humor." Both Mary and Clem appeared to be physically and mentally healthy. The social worker described the Clutter's marriage as "obviously warm, loving and friendly."

Social worker Bennett described the Clutters as being "pretty strict," but "consistent and loving in their discipline." The children were attending church and church school when they lived with the Clutters.

In conclusion, Bennett stated that the Clutters were capable, financially, physically and emotionally, to care for the Cooper children. In short, the Clutters and John Cooper were capable of providing a fine home for the children.

A second "home study" of the Clutter home was conducted by New Mexico social worker, Betty Ann Seiler. Seiler reported that Clem Clutter is calm, serious, and understanding about the Cooper children's situation. She noted that the Clutters were financially able to care for the children and their home was spacious. With respect to the Clutter household, Seiler was more guarded. She noted that Mary openly reported that she disciplined her children in the past for misconduct. Seiler, for some reason, was concerned that Mary "expressed no regrets" concerning the rigorous disciplining of her own children. Seiler also noted in the Clutters what some might consider "inflexibility and stringent expectations of themselves and others."

In sum, the Department's plan was to place the children with their Uncle Brian and Aunt Grace in their tiny house in Fort Davis. There is not much evidence about Brian's and Grace's ability to care for the Cooper children. The fragmentary proof contained in the record concerning Brian and Grace is not supportive of their parental ability to care for four more children. There is nothing in the record showing what plans, if any, Brian and Grace may have for the care of the children, especially for Kara who is in need of future medical treatment.

By way of contrast, John Cooper and the Clutters offer a stable, orderly home life for the children. John's plan for his children was articulated, and while perhaps idealized, is commendable. John has shown marked interest in the welfare and happiness of his children. Dr. Moody's comments concerning John's concern for Kara demonstrate that he will follow through with recommended treatment for that child.

It is plain that Mary and Clem Clutter offer the Cooper children a healthy, wholesome, if somewhat structured home life. In their home, the Clutters emphasize old-fashioned values of work, discipline, and motivation, values which can hardly be

faulted. The life offered the Cooper children in Ruidoso contrasts very affirmatively with the crowded and confused existence with Brian and Grace, the plan proposed by the Department.

Because the Texas Department of Human Resources failed to discharge (1) its burden of showing that the best interests of the children would not be served by the appointment of the natural parent and (2) its burden of demonstrating that its appointment as managing conservator was in the best interest of the children, this Court has concluded that it was an abuse of discretion to appoint the Texas Department of Human Resources as managing conservator.

The judgment of the district court appointing the Texas Department of Human Resources managing conservator of the Cooper children is reversed, and the cause is remanded to the district court for further proceedings.

BRADY, Justice, dissenting.

I respectfully dissent.

There is a substantial amount of evidence indicating that the appellant should not be the managing conservator of his children. The record discloses that there were three social studies conducted in this case. These reports are automatically made a part of the appellate record. *Wimpey v. Wimpey*, 662 S.W.2d 680 (Tex.App. 1983, no writ). The trial judge, in her sound discretion, no doubt considered them in determining the issue of proper custody. Two of these social studies cast serious doubt on the more favorable report relied upon by the appellant. The one and only "favorable" social study relied upon in the majority opinion is seriously flawed. According to Abraham P. DeLeon, Supervisor of the Social Services Division in Alamogordo, New Mexico, in his March 27, 1984, report to the Texas Department of Human Resources in San Angelo, "not enough time went into the family in order to know them better," and "Jan Bennett was a new worker with no experience. She based her study on one interview with the family and

children." Finally, Mr. DeLeon concluded: "I would place more credibility in the results of the second home study done by Ms. Seiler based on reasons stated above."

Ms. Seiler's evaluations and conclusions were that "it is very difficult to determine the homelife these children would have if they return to Ruidoso. I see some reason for concern regarding past behavior that is not seen as abusive by this family and was freely related to the caseworker. There is also an indication of what might be considered inflexibility and stringent expectations of themselves and others. All three family members admit to no regrets for anything that has happened in their lives prior to the removal of these children." Moreover, at least three witnesses, including Mrs. Cooper, testified that the appellant was in the habit of giving unusually harsh punishment to his children. These witnesses testified that they personally observed instances of abusive behavior on the part of the appellant. One of the witnesses related an incident in which the appellant struck one of the children with his closed fist and knocked the child to the ground. Another witness observed the appellant slapping another of his children rather severely as punishment for mischievous conduct. Other evidence indicates that appellant used a modified wood slat from a bed to dispense punishment. Appellant denied any knowledge of the use to which the wood slat was purportedly intended. Appellant further denied that he made the modification. One witness, however, testified that he observed the appellant pick up the wood slat and take one of the children into a room. The witness reported hearing the child screaming shortly thereafter. When the appellant and the child emerged from the room where the punishment took place, the witness observed seeing red marks over the child's legs. On another occasion, after Mr. Cooper returned the kids to her, Mrs. Cooper discovered large bruises over one of the children. Mrs. Cooper thereupon called the police. Photographs were made of the physical condition of the child and are a part of the record.

Appellant denies he was the producing cause of the injuries. Some witnesses testified that the children were unusually afraid of their father. Likewise, Mrs. Cooper, and another witness, testified that Mr. Cooper threatened on more than one occasion to "knock Mrs. Cooper's teeth out."

Appellant works overseas for thirty-five days and then returns to the United States for thirty-five days. Every person has a choice on how to earn a living. Appellant's significant absence, however, has an adverse impact on the development of the children. When appellant worked overseas he often left his children with his parents. The record discloses that there was conflicting testimony regarding whether it was in the best interests of the children to have appellant's parents care for the children in appellant's absence.

There was other evidence that the appellant left his children with individuals who may have neglected them. For example, the record shows that on one such occasion one of the children returned home with a four by three inch bald spot where hair had been ripped out. Finally, appellant's own witness, a woman who cared for the children for four months, remarked that she wouldn't want either parent to be her kid's parents.

In my judgment, the majority opinion has ignored the fundamental principal that in bench trials, it is the duty of the court to pass on the credibility of the witnesses and the weight to be given the testimony. *Smith v. McLin,* 632 S.W.2d 390 (Tex.App. 1982, writ ref'd n.r.e.); *Texas West Oil & Gas Corporation v. El Paso Gas Transportation Company,* 631 S.W.2d 521 (Tex. App.1982, no writ). The court, as the trier of fact, may believe a witness although he has been contradicted, and, likewise, it may believe the testimony of one witness and reject the testimony of other witnesses. *Smith, supra.* The court can accept or reject any portion of a witness' testimony. *Id.* Moreover, a trial court's decision in child custody cases is addressed to the sound discretion of the court, and will not be disturbed on appeal unless there has

been a clear abuse of discretion. *Fettig v. Fettig,* 619 S.W.2d 262 (Tex.Civ.App.1981, no writ); *Matter of Marriage of Stockett,* 570 S.W.2d 151 (Tex.Civ.App.1978, no writ). The trial judge is in a more favorable posture to evaluate the physical, mental, moral and emotional needs of a child. *Mumma v. Aguirre,* 364 S.W.2d 220 (Tex.1963). Additionally, the trial court is afforded wide discretion because of the court's opportunity to observe and evaluate personalities of contending claimants and to weigh the credibility of their testimony. *Calhoun v. Ruffer,* 425 S.W.2d 50 (Tex.Civ.App.1968, no writ). I recognize that Tex.Fam.Code Ann. § 14.01(b) (1975) gives natural parents a paramount right to custody of their children unless a positive disqualification has been shown. *Minjarez v. Minjarez,* 495 S.W.2d 630 (Tex.Civ.App.1973, no writ). Indeed, there is a strong presumption that the interests and welfare of children are best served by placing and maintaining custody in the natural parents. *Wiley v. Spratlan,* 543 S.W.2d 349 (Tex.1976). This presumption, however, is rebuttable. In the *Interest of Barrera,* 531 S.W.2d 908 (Tex.Civ.App.1975, no writ). If evidence is produced to support a finding of the non-existence of that presumed fact, the case will proceed as if no presumption existed. *Choyce v. Dallas County Child Welfare Unit of Texas Department of Human Resources,* 642 S.W.2d 559 (Tex.App.1982, no writ); In the *Interest of Gullory,* 618 S.W.2d 948 (Tex.Civ.App.1981, no writ). The evidence presented at trial was sufficient to rebut the existence of the presumption. The custody of a child, moreover, may be awarded to a third party without first adjudging the parents to be unfit if it is in the best interest of the child to do so. *Adams v. Adams,* 519 S.W.2d 502 (Tex.Civ. App.1975, no writ); *Gibson v. Hines,* 511 S.W.2d 546 (Tex.Civ.App.1974, no writ). Indeed, the controlling consideration in custody cases is the child's best interest, and not the claims of parents to custody. *Mumma, supra.* Additionally, Tex.Fam. Code Ann. § 14.07 (1975) provides in part:

(a) The best interest of the child shall always be the primary consideration of

the court in determining questions of managing conservatorship, possession, and support of and access to the child

...

(b) In determining the best interest of the child, the court shall consider the circumstances of the parents.

Where neither parent is a proper person to have custody of their children, the court can award custody to any suitable person disposed to assume such responsibility. *Bough v. Bough*, 263 S.W.2d 573 (Tex.Civ. App.1954, no writ). The majority takes issue with the fact that the individuals who would care for the children as managing conservators, Brian and Grace Cooper, could provide only a tiny and cramped living environment. The record reveals, however, that Brian and Grace have had their home remodeled to provide for adequate room for the four children.

I would therefore hold that the record as a whole demonstrates that the trial court's judgment was correct. I am unable to find that the trial judge committed a *clear* abuse of discretion.

The judgment of the trial court should be affirmed.