In re W.G.W., a Child.

No. 01–90–00172–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

June 27, 1991.
Rehearing Overruled July 18, 1991.

Lorie Ann Jones, Galveston, for appellant.

R.A. Apffel, Galveston, for the State.

Thomas W. McQuage, Galveston, for appellee.

Before MIRABAL, PRICE and O'CONNOR, JJ.

## OPINION

O'CONNOR, Justice.

This pro se appeal involves the standard the court must apply when a non-parent asks to be appointed managing conservator of a minor child. Following the jury findings, the trial court appointed P.W., a non-parent, as managing conservator of W.G.W. The mother, L.A.J., who was represented at trial by an attorney, brings this appeal pro se, asserting four points of error. On our own motion we identify the parties by fictitious names. TEX.FAM.CODE ANN. § 11.19(d) (Vernon 1986).[1] We reverse and remand for a new trial.

L.A.J. ("the Mother") and P.W. ("Patrick") were married for one year and had a daughter, Wendy. The marriage ended in 1981, and Patrick was appointed the sole managing conservator of Wendy. Patrick got custody of their daughter by default judgment, because the Mother could not afford a lawyer. The Mother moved out after the divorce, but two years later, when she became pregnant with W.G.W., the child in this suit, she moved back with Patrick. Patrick is not the biological father of W.G.W.; everyone admits that another man, not involved in this litigation, is the biological father. W.G.W. bears the same last name as Patrick because, at the time of his birth, the Mother was still using Patrick's last name.

The Mother lived with Patrick, their daughter Wendy, and W.G.W. until W.G.W. was six months old. During that period there was conflict between the Mother and Patrick: the Mother claims Patrick was often intoxicated and violent; Patrick claims the Mother had male visitors while W.G.W. was present.

The Mother moved out of Patrick's house, and in 1986 moved to Waco, where she lived with O.W. Holmes, Jr.,[2] and W.G.W. In 1988, while in Waco, the Mother was diagnosed with cervical cancer. She came to Houston for a second opinion and for an operation, and left W.G.W. with Patrick. During the Mother's recuperation from the operation, Patrick decided to file for conservatorship of W.G.W.

At the time of trial, the Mother had lived continuously with Holmes since 1988, and they planned to marry. The Mother testified that, during those years, W.G.W. spent more time with Holmes than with Patrick. When asked why she permitted Patrick to have access to W.G.W. even though he was not W.G.W.'s father, the Mother said that she wanted W.G.W. to have a relationship with a male figure, and she wanted him to see his sister, Wendy, who lived with Patrick.

Holmes testified to the love and affection surrounding W.G.W. He stated that W.G.W. enjoyed a stable routine and was a disciplined child when in the care of the Mother. A personal friend of the Mother stated that the Mother was the primary caretaker throughout W.G.W.'s life and alleged that Patrick was once in an intoxicated state while W.G.W. was in his care. Holmes' father stated that W.G.W. enjoyed a close loving relationship with the Mother and his son. Holmes' sister testified that the Mother was a caring mother and provided W.G.W. a disciplined and structured home environment. The Mother's mother testified that she enjoyed a close relationship with W.G.W.

Patrick elicited testimony that the Mother changed residences a number of times after W.G.W. was born.[3] Patrick also com-

---

1. Throughout this opinion, the Texas Family Code will be referred to as "the Code."

2. Mr. Holmes, a law student at the time of the trial, helped the Mother, who had run out of money to pay her lawyer, with this brief. The Mother testified at trial that the attorneys fees represented a substantial burden, that she was making $6.50 an hour, with take home pay of $150 a week.

3. When the Mother left Patrick's house, she first worked as a housekeeper for room and board;

later, she got her own apartment when she got a job at a car dealer; she moved again after she lost that job; she moved again after she rented a large apartment to share with a friend and the friend decided not to go in with her; she moved again to be close to her church; and later, when she lost her job and got another. All her moves were from one apartment to another and most moves were related to her employment. Her last move before the lawsuit was in 1988, to Waco where she lived with Holmes, who was in law school there.

plained that the Mother had two steady male companions after she left him.[4] Patrick testified that the Mother did not provide a stable environment for W.G.W. and considers himself the "father" since birth. Patrick claimed that the Mother attacked him with a knife in front of W.G.W., when he was a few months old.

Patrick's next door neighbors testified that while the Mother was living with Patrick shortly after the birth of W.G.W., the Mother had male visitors at the house during the day when Patrick was at work.[5] The neighbors also said that the Mother went out at night, leaving W.G.W. in Patrick's care.[6] The neighbors also stated that Patrick had more physical contact with W.G.W. than the Mother and that W.G.W. calls Patrick "Daddy," and felt that it would be in W.G.W.'s "best interest to be with" Patrick. They testified to various arguments between the Mother and Patrick, detailing one incident in which the Mother brandished a fireplace poker and threatened Patrick.

Ms. McCullough, a woman who operates a licensed day care center, which W.G.W. attended between the ages of three and five and a half, testified for Patrick. McCullough recited that she was a licensed day care director, had taken about 146 hours of college courses in psychology and early childhood development, had six years experience in day care operation, 10 years experience as a substitute school teacher, and two years experience as a teacher's aide for emotionally disturbed children. She stated that, from her education and experience, she could determine what was normal emotional and psychological development for children between the ages of four to six.

McCullough testified that, when she first met W.G.W., he had a discipline problem. She said that W.G.W. was emotionally and academically behind his peers at age three. She did not think W.G.W. had the ability to interact with his peers; that he was unduly angry, and did not participate in group activities. She thought W.G.W. improved emotionally while under Patrick's care, and regressed when under the Mother's care. She found that the Mother was uncooperative with the suggestions McCullough provided for improving W.G.W.'s psychological and emotional development. She thought the Mother had a "bad attitude" toward these matters and regarded W.G.W.'s behavioral problems as a "joke." McCullough noticed that W.G.W. was torn emotionally between the structured and supportive environment provided by Patrick, as contrasted with the erratic or unstructured environment provided by the Mother.

Patrick sought appointment as W.G.W.'s sole managing conservator. Under TEX. FAM.CODE ANN. § 11.03(a)(8) (Vernon Supp. 1991) and TEX.FAM.CODE ANN. § 11.13(a) (Vernon 1986), the fact issues of Patrick's standing to bring the suit and the statutory elements required for his appointment were tried to a jury. The proceeding was governed by TEX.FAM.CODE ANN. § 14.01(b) (Vernon Supp.1991), which provides:

(b) A parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child unless:

(1) the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development....

The jury was asked in two questions:

2. Do you find from a preponderance of the evidence that the appointment of [the Mother] as managing conservator would

---

4. From 1983, when she left Patrick, to 1989, the time of the suit, the Mother had lived with two men. The first was for a couple of months, and the Mother admitted it was a mistake. The second was with Holmes, whom she intends to marry.

5. Donnie, a friend of Patrick's, visited the Mother a couple of times when Patrick was present

and other times when he was not. Colvin, a neighbor, came over when Donnie was visiting. She saw Donnie visit about five or six times. No one testified that anything improper happened.

6. Mrs. Colvin, the neighbor, went out with the Mother.

not be in the best interest of the child because the appointment would significantly impair the child's health or emotional development?

Answer: "We do" or "We do not"

ANSWER: *WE DO*

3. Do you find from a preponderance of the evidence that the appointment of [Patrick] as managing conservator would be in the best interest of the child? ....

Answer: "We do" or "We do not"

ANSWER: *WE DO*

## I. Challenges to the sufficiency of the evidence

 The right to raise one's children has been deemed an "essential right," and a "basic civil right of man" and woman. *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972); *Prokopuk v. Offenhauser,* 801 S.W.2d 538, 539 (Tex.App.—Houston [1st Dist.] 1990, writ denied). The presumption that the best interest of a child is served by awarding custody to a natural parent is deeply embedded in Texas law. *Lewelling v. Lewelling,* 796 S.W.2d 164, 166 (Tex.1990). The natural right between parent and the child is one of constitutional dimensions and should not be disturbed except for the most compelling and serious reasons. *Cooper v. Texas Dep't of Human Resources,* 691 S.W.2d 807, 808 (Tex.App.—Austin 1985, writ dism'd). The law presumes that the interest of young children are best served by naming their natural parents as managing conservator. *Mumma v. Aguirre,* 364 S.W.2d 220, 221 (Tex.1963).

 The party seeking to bar the natural parent from appointment as managing conservatorship has the burden to show that the best interest of the child would be best served by the appointment of a nonparent. *Herrera v. Herrera,* 409 S.W.2d 395, 396 (Tex.1966). To restate the standard in terms of § 14.01(b) of the Code, the party seeking to bar the natural parent from appointment as managing conservator must prove that the appointment of the parent would not be in the best interest of the child because the appointment would significantly impair the child's physical

health or emotional development. *Lewelling,* 796 S.W.2d at 166; TEX.FAM.CODE ANN. § 14.01(b)(1). That another person would be a better custodian of a child is not enough to rebut the parental presumption absent the impairment of physical health or emotional development. *Lewelling,* 796 S.W.2d at 167.

Patrick bore the burden of proof on the jury's findings. The supreme court requires Patrick, as a non-parent, to identify some act or omission committed by the Mother which demonstrates that naming her as managing conservator will significantly impair W.G.W.'s physical health or emotional development. *Lewelling,* 796 S.W.2d at 168.

### A. Legal sufficiency

 In point of error one, the Mother urges there was no evidence to support the jury's finding to question two, that appointing her as managing conservator would significantly impair the child's physical health or emotional development. When reviewing a legal sufficiency or "no evidence" point, we must consider only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding, and disregard all evidence and inferences to the contrary. *Lewelling,* 796 S.W.2d at 166; *Texaco, Inc. v. Pennzoil, Co.,* 729 S.W.2d 768, 787 (Tex. App.—Houston [1st Dist.] 1987, writ ref. n.r.e.). If there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Lewelling,* 796 S.W.2d at 166. If the evidence does more than create a mere surmise or suspicion of its existence, there is more than a "scintilla" of evidence. *See Kindred v. Con/ Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983).

The jury was required to return an answer favoring the Mother unless they found that her appointment "would significantly impair the child's physical health or emotional development." TEX.FAM.CODE ANN. § 14.01(b)(1). The best interest of the child is always the primary consideration in deciding the question of managing conservatorship. TEX.FAM.CODE ANN. § 14.07(a) (Vernon 1986).

■ From the evidence outlined above, under this point we must consider only the evidence that supports the finding that the appointment of the Mother "would significantly impair the child's physical health or emotional development." When we look at the record with that restriction, the only evidence we can find that supports the finding is that given by McCullough. We find that her testimony was more than a scintilla, enough to overrule a no evidence point.

We overrule point of error one.

## B. Factual sufficiency

■ In point of error two, the Mother contends there is insufficient evidence to support the jury's finding to question two.[7] Patrick had the burden of proof on the jury question. Because the burden was his, he was required to secure a finding that was based on the preponderance of the evidence. Because the jury found in favor of the questions on which Patrick had the burden of proof, the Mother must now argue that Patrick did not carry his burden and prove the issues by a preponderance of the evidence. Thus, her points are properly cast as "insufficient evidence" points of error.[8] Under such a challenge, we must examine all of the evidence—the evidence that favors and the evidence that disfavors—the jury's finding and, if we decide the evidence is so weak that the jury's finding is clearly wrong and unjust, only then should we set aside the verdict.[9] *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

This Court must now consider all the evidence in the record, both the evidence that supports the finding and the evidence that contradicts the finding.

■ The record as a whole supports the following conclusions: The Mother and Patrick had an unsuccessful marriage; after the divorce, when the Mother found herself pregnant, Patrick agreed she could move in with him, not in an attempt to restore the marriage, but simply for convenience; after W.G.W. was born, she continued to live with Patrick; during the time they lived together, they did not get along, and at times abused each other; after the Mother left Patrick's house, she moved around a number of times; both of them care for W.G.W. very much; at the time of the trial, the Mother had a long-term relationship with another person, whom she intended to marry.

Although Patrick and his witnesses testified that the Mother had male friends at the house, the prejudicial effect of such testimony is lessened by Patrick's testimony that his relationship with the Mother when she moved back into the house was not an attempt to revive the marriage, but simply to help her out. In addition, no one testified that the Mother had overnight visitors or that the mother and the visitors behaved in any improper way in front of W.G.W., who was between three and six months of age at the time.

In light of all the evidence presented, we hold that the jury's finding on question two, that the appointment of the Mother as managing conservator would significantly

---

7. We note that the concurrence suggests that we should not reach the factual sufficiency issue because we sustain point of error four. A factual sufficiency point of error is uniquely within our jurisdiction and cannot be reviewed by the supreme court, unless we apply the wrong standard. If we followed the advice of the concurrence and did not resolve the factual sufficiency challenge, and if the supreme court were to reverse our holding on the legal sufficiency point, the court would be forced to remand the case to us to consider the factual sufficiency point. Thus, in the interest of judicial economy, we feel compelled to address the factual sufficiency point of error.

8. If the Mother were challenging questions on which she had the burden of proof, she would cast her points as "great weight" points of error.

9. Both "insufficient evidence" and "great weight" points of error call into play the same test of the evidence, with slightly different wording. When an appellant challenges a finding with the "great weight" point, we examine all of the evidence, both the evidence that favors and the evidence that disfavors the jury's finding, *and if we decide the finding is so against the great weight and preponderance that it is clearly wrong and unjust,* only then should we set it aside. *In re King's Estate,* 244 S.W.2d 660, 661 (Tex.1951).

impair the child's health or emotional development, is against the great weight and preponderance of the evidence, is clearly wrong, and is manifestly unjust. We sustain point of error two.

## II. Prejudicial evidence

In point of error three, the Mother contends the trial court erred in overruling her motion for new trial. In her motion for new trial, the Mother claimed the court permitted the introduction of evidence over her objection which was extremely prejudicial to her defense.[10] The Mother contends that Patrick violated a motion in limine and she was "severely prejudiced" by his "extremely prejudicial accusations."

### A. The documentary evidence

■■■ The court granted the Mother's motion in limine to prevent Patrick from referring to or alluding to documents not tendered in discovery. The Mother contends Patrick was permitted to "page through" certain documents in front of the jury and ask the Mother about matters in the documents. Through that tactic, the Mother contends the documents were shown to the jury. A review of the statement of facts, pages 45 through 46, reveals that the Mother's objection to documents was sustained. There is no objection to Patrick's counsel paging through documents in front of the jury. We overrule the first contention under the Mother's point of error three.

### B. The prejudicial remarks of counsel

In the second contention under her point of error three, the Mother alleges she was harmed by three prejudicial statements of opposing counsel. We deal with them under separate headings.

### 1. The prejudicial question

■■■ Patrick's counsel asked the Mother, "Since the birth of W.G.W., have you had any abortions?" The Mother's counsel objected, the objection was sustained, and the trial court instructed the jury to disregard the form of the question. A few minutes later, Patrick's counsel again asked the question, and again the Mother's counsel objected. Counsel for Patrick explained the reason for the question as "It goes to her credibility and her stability." The court sustained the objection, but the Mother's counsel did not ask for a second instruction to disregard the question.

The Mother complains that the question about abortions was completely unprovoked and was not curable. To obtain reversal of a judgment on the grounds of an improper question posed by counsel, an appellant must prove that the question was so prejudicial and inflammatory as to reasonably be calculated to produce an improper verdict. See *Niemann v. State*, 471 S.W.2d 124, 130 (Tex.App.—San Antonio 1971, no writ). We hold, on this record, that the questions asking the Mother if she had had abortions was improper, prejudicial, and reasonably calculated to produce an improper verdict. We sustain the point of error as to the questions about abortion.

### 2. The side-bar remarks

■■■ Holmes' sister testified that she had a child just about the same age as W.G.W., that she stayed at the Mother's apartment some weekends, that the apartment had a pool, and that the children played together. Following the question whether she lived with the Mother, she said no, that she "woke up some mornings with her," Patrick's counsel made the side bar comment, "I bet." The Mother's counsel objected and the objection was sustained. On appeal, the Mother complains that the

---

10. Again, we note that the dissent contends we should not address this point of error. Again, we disagree. Our court, as an intermediate court, is a court of mandatory jurisdiction, not a writ of error court, as is the Texas Supreme Court. From our Court, cases are appealed to the supreme court, where jurisdiction is limited to error which is "of such importance to the jurisprudence of the state that ... it requires correction," and other defined matters listed in Tex.Gov't Code Ann. § 22.001 (Vernon 1988). Mere errors of law are no longer relevant to the issue of the supreme court's jurisdiction. Now, the supreme court is required to intervene *only* when the error is important to the jurisprudence of the state. Here, the error is important to the parties and to the retrial of the case. We believe we are correct in addressing it.

side bar comment amounted to an "insinuation that the Mother had engaged in homosexual activities with Ms. [Holmes]."

■ Rule 269 states that the trial court will rigidly repress side bar remarks. The court is not required to wait for an objection when rule 269 is violated. Side bar remarks are remarks of counsel that are neither questions to the witness nor comments addressed to the court. *Middleton v. Palmer*, 601 S.W.2d 759, 763 (Tex.App.—Dallas 1980, writ ref'd n.r.e.). They are condemned because of their risk of error. *Id.* Not every side bar remark, however, is grounds for reversal. *Id.* To obtain reversal of a judgment on the basis of improper side bar comment, an appellant must prove the side bar remark interferes with the appellant's right to a fair trial. *Id.* Here, the inference of homosexual conduct was oblique. We cannot say that the meaning of the side bar remark was clear to the jury. Thus, we overrule the point of error as it relates to the side bar remark.

### 3. The prejudicial jury argument

■ In Patrick's closing argument, his counsel said, "Think about cervical cancer and how you get it." The Mother's counsel made no objection to this statement. The Mother contends that this alleged statement was designed to "inflame the jury."

The Mother complains that the statement about cervical cancer was completely unprovoked and was not curable. To obtain reversal of a judgment on the basis of improper jury argument, the supreme court has instructed us that an appellant must prove four of the elements set out in *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839–40 (Tex.1979).

Was the argument error? After examining the record, we can find nothing that supports the inference that cervical cancer is caused by immoral conduct or abortions, the clear implication of counsel's statement. We hold this argument was error.

Was the argument invited or provoked? Counsel for Patrick was the first to argue to the jury. After examining the record we find nothing that preceded the argument that could possibly justify the statement. We hold the argument was not invited or provoked.

Was the argument, by its nature, degree, and extent, reversible error? After examining the record, we hold that the cumulative effect of the statement, with Patrick's attempt to paint the Mother as an immoral woman, constituted harmful error.

Did the appellant preserve an objection to the erroneous argument by the proper trial objection? The Mother's counsel did not object to the argument, and thus did not preserve error. In such a case, the Mother must show that the error was not curable, the last of our inquiries.

Was the error curable by an instruction? Because the Mother's counsel did not object, if she is to prevail on this point of error, she must show that the error was not curable. There are only rare instances of incurable harm from improper argument. *Reese*, 584 S.W.2d at 839. The appellate court must determine if the probability that the improper argument caused harm is greater than the probability that the verdict was based upon proper proceedings and evidence. *Id.* at 840. The appellate court must evaluate the improper jury argument in light of the whole case, beginning with voir dire and ending with closing argument. *Luna v. North Star Dodge Sales, Inc.*, 667 S.W.2d 115, 120 (Tex.1984); *Reese*, 584 S.W.2d at 839.

We hold that the remark probably contributed to the jury's finding that the Mother, as managing conservator, would significantly impair the child's physical health or emotional development. We sustain her third point of error challenging the improper jury argument.

### 4. Explanatory definition

■ In point of error four, the Mother urges that the trial court erred in refusing to submit to the jury an explanatory definition of "significantly impair." The Mother objected to the absence of a definition and tendered a definition based on the law found in *Neely v. Neely*, 698 S.W.2d 758, 759 (Tex.App.—Austin 1985, no writ) and *Cooper*, 691 S.W.2d at 811. Thus, by sub-

mitting a requested definition, the Mother met her burden to properly object to the absence of a definition in the charge. *Yellow Cab and Baggage Co. v. Green*, 277 S.W.2d 92, 93 (Tex.1955); *Texas Gen. Indem. Co. v. Moreno*, 638 S.W.2d 908, 914 (Tex.App.—Houston [1st Dist.] 1982, no writ); *Swenson v. Swenson*, 466 S.W.2d 424, 427 (Tex.App.—Houston [1st Dist.] 1971, no writ); TEX.R.CIV.P. 274, 279.

The definition derived from the holdings from *Neely* and *Cooper* was:

> "Significantly impair the child's health or emotional development" usually means evidence of physical abuse, severe neglect, abandonment, drug or alcoholic abuse, or very immoral behavior on the part of the parent. The natural rights between a parent and a child should be disturbed for only the most compelling and serious of reasons.

*Neely*, 698 S.W.2d at 759; *Cooper*, 691 S.W.2d at 811.

In response to the objection and tender, the trial court stated it felt that "the example cited in *Neely* and *Cooper* are not all inclusive and further, that the words are of ordinary understanding" and overruled the objection. Patrick argues that jurors are presumed to have average intelligence, so the court is "not required to convert the charge into a dictionary," citing *Texaco, Inc.*, 729 S.W.2d at 814.

■ To determine whether an error in the jury charge is reversible, the appellate court must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986). We will deem error reversible only if, when viewed in light of the totality of the circumstances, we find it amounted to such a denial of the rights of the complaining party that it was reasonably calculated to and probably did cause the rendition of an improper judgment. *Id.*; TEX.R.APP.P. 81(b)(1).

Rule 277 of the Texas Rules of Civil Procedure directs "the court shall submit such instructions and definitions as shall be proper to enable the jury to enter a verdict." Patrick argues that by highlighting that such cases usually include evidence of physical abuse, severe neglect and chemical abuse, the judge would have been suggesting to the jury to find in the Mother's favor because those items of evidence were absent from this case.

The trial court has considerable discretion in deciding which instructions and definitions are necessary and proper. *Johnson v. Whitehurst*, 652 S.W.2d 441, 447 (Tex. App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). An appellant cannot show an abuse of discretion unless the requested instructions were so necessary to enable the jury to render properly a verdict that the court's refusal probably did cause rendition of an improper verdict. *Steinberger v. Archer County*, 621 S.W.2d 838, 841 (Tex.App.— Fort Worth 1981, no writ).

In this case, the jury was presented with a charge that required them to decide if the Mother would "significantly impair" the child's health or emotional development without any guidance as to the meaning of that term. The result of the entire case hinged on what conduct is considered so detrimental to the child's interest that it would significantly impair the child's health or emotional development. The charge, without that definition, did not inform the jury what standard to apply to properly weigh the evidence and return a proper verdict. Thus, we sustain point of error four.

MIRABAL, J., concurs.

MIRABAL, Justice, concurring.

I concur in the result, but I do not fully join in the majority's opinion.

Although the majority sets out the correct standard of appellate review for the consideration of a "no evidence" point, in my opinion the majority has failed to apply that standard in its review of appellant's point of error one. I disagree with the majority's conclusion that the *only* evidence that supports the jury's answer to question number two is the testimony of Judy McCullough. Following is a summary of *only the evidence and inferences*

*that, when viewed in their most favorable light, tend to support* the jury's finding that the appointment of the Mother as managing conservator would *significantly impair* the child's health or emotional development.

It is noteworthy that the evidence in this case is very contradictory. Facts, such as the history of the child's living accommodations since he was born, are hotly contested. In reviewing a "no evidence" point, we must disregard all evidence and inferences that are contrary to the jury's finding.

In reviewing the legal sufficiency of the evidence, this Court is not to pass judgment upon the life style or pattern of living of appellant or appellee; rather, we must simply determine whether appellee has discharged his burden of producing more than a scintilla of evidence to support the findings of the jury under the charge given. *See Barron v. Bastow*, 601 S.W.2d 213, 215 (Tex.Civ.App.—Austin 1980, writ dism'd).

Appellant ("the Mother") was 17 when she married Patrick.[1] They cohabitated together for approximately one year before they married, and they divorced in 1981 after one year of marriage. A daughter, Wendy, was born to that marriage, and Patrick was appointed sole managing conservator of the child.

Within about two years after the divorce, and while she was sharing an apartment with three men, the Mother became pregnant again. In November of 1982, the Mother came to Patrick, explaining to him that she found herself with no money, no car, and no place to go. Patrick took her in to live with him and their daughter in his apartment in Pearland, Texas, and later in Friendswood.

The child was born on June 14, 1983, when the Mother was about 20 years old. By the time the child was two or three months old, the Mother began an active social life. From about August through December of 1983, the Mother established a pattern of going out at night, dating and frequenting bars. The Mother would usually remain out in the evenings and return home when the bars closed, at 2:00 or 3:00 a.m. When she went out, she entrusted the care of the baby to Patrick or Patrick's mother.

Also during this period of time, the Mother had friends come over to the apartment while Patrick was away from the home at his job. The neighbors particularly noticed one Donnie, whom they observed visited the Mother in Patrick's apartment starting in August or September of 1983, when the baby was about two months old. On these occasions, Donnie would visit with the Mother from about 9:00 a.m. until 3:00 or 4:00 p.m., departing shortly before Patrick returned home from work. During these daytime visits, the baby was present in the apartment with the Mother. One neighbor observed Donnie visiting the apartment on approximately 10 different occasions.

In about February of 1984, when the child was about eight months old, Patrick told the Mother to leave the apartment. At that time, the neighbors noticed a heated argument between Patrick and the Mother; the Mother brandished a fireplace poker. The next door neighbors and local police intervened in this argument. At the instance of the neighbor and the police, Patrick was persuaded to permit the Mother to reenter the apartment, and remove her personal belongings. The Mother thereupon moved out of the apartment with her things and with the child.

The Mother and the child moved into the apartment of a friend in Houston, where they remained for the next two months. She got a night time job, and although she no longer lived in Patrick's apartment, she utilized his babysitting services approximately four nights per week and on weekends.

For about six months, from about May through October 1984, when the child was about 12 to 18 months old, the Mother and the child lived with a family where she was a live-in nanny. During this period of time,

1. The concurring opinion refers to the interested parties by the fictitious names used by the majority.

when the Mother went out at night, Patrick continued to babysit with the child 10 to 15 evenings per month during the week, and he kept the child with him about three weekends per month. Patrick developed a pattern of picking the child up in the evening for overnight stays, or until the Mother picked him up in the early morning hours.

Around October 1984, the Mother and the child moved into an apartment in Pasadena, Texas, and she got a day time job at a car dealership. During the day, the child was at a day care center. At least a couple of nights a week, and on weekends, the Mother went out and Patrick took care of the child.

The Mother was laid off at the car dealership, and was evicted from her apartment. Patrick helped her move into another apartment and paid her rent until she got an evening job at a night club. The child stayed with Patrick every night for about two months. For about one month, the Mother had a gentlemen friend staying overnight in the apartment in the presence of the child, who was about 19 months old.

About January 1985, the Mother moved again. She was not working and Patrick again paid her rent. Patrick testified he funded the Mother's expenses in response to her threat to withhold the child from him if he didn't.

The Mother took an evening job at a restaurant, and during this period Patrick kept the child one to two evenings per week, plus weekends. The restaurant job lasted less than a month.

Within another three months, the Mother had moved again, and Patrick again paid her rent. At that time, the Mother was unemployed, and she moved out of the new apartment after approximately two months.

From March 1984, to about September 1985, when the child was between 9 months old and 15 months old, the Mother and child moved eight different times.

During 1985 and the first part of 1986, Patrick continued to finance part of the Mother and the child's living expenses. In addition, Patrick bore the cost of the Mother's attendance at cosmetology school, which she did not complete. Patrick also continued the pattern of providing babysitting service for the child while the Mother worked or socialized in the evenings. As a result, the child apparently spent about one-half of his evenings with Patrick.

In about April of 1986, when the child was almost three years old, the Mother took up residence with one Mr. Lambert. The Mother's cohabitation with Mr. Lambert, with the child in the same home, again created friction between Patrick and the Mother, resulting in arguments about the impact of this arrangement on the child's psychological welfare. On the occasion of one such argument, in September of 1986, the Mother tried to stab Patrick with a knife, in the presence of both her children.

Patrick continued his pattern of keeping the child in the evenings, while the Mother either worked or socialized. Patrick would pick the child up from the day care center when he would finish work. The Mother would usually pick up the child late in the evenings during the week. At that time, during the latter half of 1986, the child was staying with Patrick almost every evening during the week, and overnight two to three weekends per month.

The Mother and Mr. Lambert broke up after about five months of cohabitation. The Mother and the child moved into an apartment in Pearland, Texas.

After a few months, in about March 1987, the Mother and child moved to another apartment in Pearland. From May to early September 1987, when the child was four years old, O.W. Holmes, Jr., who is five years younger than the Mother, lived with the Mother and the child in that one bedroom apartment. In September, Mr. Holmes returned to school in Austin. During this period, from March through September, 1987, Patrick continued to take care of the child evenings during the week, and on many weekends.

Toward the end of the year, the Mother lost her job, and Patrick again helped her pay living expenses.

In November 1987, the Mother and the child went to Austin and stayed for one month.

Then she and the child stayed at Mr. Holmes' father's house in the Galveston area for two to four weeks.

Then she and the child moved into a trailer in Santa Fe, near Galveston, where they lived for approximately three months, from December 1987 to March 1988, when the child was 4½ years old. During that three month time, the Mother worked at three different restaurants, not staying at any one for very long. When she worked at night, Patrick would take care of the child.

In mid-March 1988, the child came to live with Patrick, and continued to live there for two months, until approximately mid-May of that year.

In May of 1988, the Mother moved to Austin to live with Mr. Holmes, and took the child with her.

One month later, she moved with the child and Mr. Holmes to Waco, where Mr. Holmes was to attend law school.

Within about two months after the move to Waco, in August 1988, the Mother and the child moved out of Mr. Holmes' home and moved to the Mother's parent's home in Galveston.

At that time, when the child was five years old, the Mother decided to let the child stay with Patrick during the school year. The child lived with Patrick continuously from August 1988 until the filing of Patrick's petition in April 1989, and through the date of trial in July 1989, when the child was six years old.

The Mother's motivations for relinquishing the son to Patrick's care are not entirely clear. The Mother suggested that she had turned the child over to Patrick when she discovered that she had contracted cervical cancer, and she left the child in Patrick's care during her six month recovery from surgical treatment. The surgery was performed in one day, and the Mother made a 250 to 300 mile drive to Waco two to three days later. She had a relapse in September 1988, and was hospitalized for three days. The Mother told a former neighbor that the cancer was not the reason for turning the child over to Patrick; that, in fact, she intended to leave the child with Patrick at least for his kindergarten school year, to provide the child a more stable environment.

From August 1988 through the Spring of 1989, the Mother only saw the child for brief visits during Thanksgiving and Christmas of 1988, and spring break of 1989.

In April of 1989, the Mother told Patrick that she was again breaking up with Mr. Holmes. She informed Patrick she was moving back to Galveston from Waco to live with her parents, and intended to reclaim the child. At that point, Patrick sought legal counsel, and filed this lawsuit.

The Mother did in fact move in with her parents in Galveston in April 1989. About two weeks prior to trial, the Mother again reconciled with Mr. Holmes and moved to Waco to live with him.

Between February 1984, when the child was eight months old, and June 1989, when the child was six years old, the Mother had changed residences approximately 21 times.

Patrick offered the testimony of Judy McCullough, who became acquainted with Patrick, the Mother, and the child in connection with providing day care services to the child at various times when he was between the ages of three and 5½ years old. Ms. McCullough recited that she was a licensed day care director, had taken about 146 hours of college courses in psychology and early childhood development, had six years experience in day care operation, 10 years experience as a substitute school teacher, and two years experience as a teacher's aide for emotionally disturbed children. She stated that, from this experience and education, she could observe children of ages four to six, and determine their emotional and psychological normality.

Ms. McCullough testified that, when she first met the child, he was a discipline problem. She said that the child was emo-

tionally and academically behind his peers at age three. She saw in the child an inability to interact with his peers; that he was unduly physical and angry, and did not participate in group activities. She opined also that the child achieved temporary improvement in his emotional and psychological development while under Patrick's care, disrupted by those occasions when the Mother asserted her influence over the child. She found that the Mother was uncooperative with the suggestions Ms. McCullough provided for improving the child's psychological and emotional development. She observed in the Mother a "bad attitude" toward these matters, and gathered the Mother regarded the child's behavioral problems as a "joke." Ms. McCullough observed also that the child was torn emotionally and psychologically between the structured and supportive environment provided by Patrick, as contrasted with the erratic or unstructured environment provided by the Mother. She testified to her consistent observation of the child's reversion to a subpar emotional state whenever the child had been in the care of his Mother.

The trial of this case lasted three days. The jury heard testimony from 10 witnesses. After less than three hours of deliberation, 11 out of 12 jurors found the appointment of the Mother as managing conservator of the child would "significantly impair the child's health or emotional development." The jury apparently agreed with Patrick's theory of the case, that the Mother's attitudes and lifestyle demonstrated an unnatural and potentially injurious lack of commitment to the child's physical and emotional welfare, especially when compared with her level of commitment to her own self-interests.

Rejecting all evidence contrary to the jury's answer, and considering only facts and circumstances that tend to support that answer, I am of the view that there is some evidence, constituting more than a scintilla, to support the jury's answer.

I, therefore, agree with the majority that point of error one should be overruled.

In point of error four, appellant asserts the trial court erred in refusing to submit an explanatory definition with jury question number two. I agree we should sustain point of error four, for the reasons stated by the majority. I concur that it was reversible error for the trial court to refuse to submit to the jury the requested explanatory definition of "significantly impair" in connection with the jury question asking whether the appointment of the Mother as managing conservator would "significantly impair the child's health or emotional development." In my opinion, the Mother tendered a substantially correct definition and instruction.

The legislature requires a showing of not just injury or impairment, but of "significant impairment," before a natural parent's managing conservator rights can be taken away. TEX.FAM.CODE ANN. § 14.01(b)(1) (Vernon Supp.1991). In the context of this statute, as applied to this case involving a six year old child, I do not agree that the phrase "significantly impair" has a common meaning that reasonable people would agree on without guidance. Therefore, I agree we should sustain point of error four, reverse the judgment, and remand the case for a new trial with a proper jury charge.

I do not agree that it is necessary or important for us to address the merits of appellant's points of error two and three, in light of our overruling point of error one and sustaining point of error four. Therefore, I do not join in the majority's conclusion, under point of error two, that based on the jury charge actually given, the evidence was factually insufficient to support the jury's verdict. Since the jury charge was so defective that a reversal and remand for new trial is necessary, it is irrelevant whether the evidence was factually sufficient to support the verdict under the erroneous charge. Further, I do not join in the majority's conclusions, under point of error three, that the complained about questions and jury argument constituted reversible error.

I concur in the reversal and remand.