**Opinion issued April 21, 2017**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-16-00851-CV

## NO. 01-16-00852-CV

## NO. 01-16-00875-CV

———————————

**IN THE INTEREST OF R.L. AKA R.C. AKA R.M. AND R.L., CHILDREN**

**IN THE INTEREST OF C.C.J., A CHILD**

**IN THE INTEREST OF C.J., A CHILD**

---

**On Appeal from the 311th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 2009-03954, 2013-49862, and 2014-29889[1]**

---

## MEMORANDUM OPINION

---

[1]    Appellate cause no. 01-16-00851-CV; trial court cause no. 2009-03954.
Appellate cause no. 01-16-00852-CV; trial court cause no. 2014-29889.
Appellate cause no. 01-16-00875-CV; trial court cause no. 2013-49862.

In these accelerated appeals,[2] appellant, T.H.L., challenges the trial court's orders, entered after a bench trial, awarding the Department of Family and Protective Services ("DFPS") permanent managing conservatorship of her four minor children, R.C.,[3] R.L., C.J., and C.C.J. (collectively, "the children").[4] In her sole issue, T.H.L. contends that the trial court erred in appointing DFPS as the children's permanent managing conservator.[5]

We affirm.

## Background

On August 23, 2013, DFPS filed its "Original Motion to Modify for Conservatorship," seeking managing conservatorship of R.C. and R.L., and its "Original Petition for Protection of a Child for Conservatorship," seeking managing conservatorship of C.J. On May 27, 2014, DFPS filed its "Original Petition for Protection of a Child for Conservatorship," seeking managing conservatorship of C.C.J.[6] DFPS attached to its motion and petitions, the affidavit of DFPS Investigator Patrick Atkins.

---

[2] *See* TEX. FAM. CODE ANN. § 263.405(a) (Vernon 2014); TEX. R. APP. P. 28.4.

[3] For clarity purposes, we use the initials "R.C." when referring to the child named: R.L., also known as R.C., also known as R.M.

[4] At the time of trial, R.C. was sixteen years old, R.L. was twelve years old, C.J. was four years old, and C.C.J. was two years old.

[5] *See* TEX. FAM. CODE ANN. § 263.404 (Vernon Supp. 2016).

[6] Although DFPS initially sought termination of T.H.L's parental rights to the children, it abandoned its termination claim at trial.

2

In his affidavit, which the trial court admitted into evidence, Atkins testified that on June 17, 2013, DFPS received a report of neglectful supervision of the children. On June 13, 2013 at 1:00 a.m., when T.H.L. left her home "to clear her head," her fiancé, D.J.,[7] and her son, C.J., who was six months old, were in her bedroom. When T.H.L. returned home at 6:00 a.m., she "noticed . . . blood on the bed," but did not "enter [her] room," even though she was aware that C.J. was still inside. Instead, T.H.L. went upstairs, had her mother call for emergency assistance, and had her daughter, R.C., who was thirteen years old at the time, "go downstairs to get [C.J.] from the room." D.J. died from "blunt force trauma to the head." T.H.L. reported that "[a]t the time of [D.J.'s] murder," she was "parked at a park" near her home "talking to a friend" on her cellular telephone and then went to a store. According to Atkins, T.H.L. and her ex-husband R.A.L., the father of R.C. and R.L.,[8] were the "prime suspects in the murder" of D.J. and the "oldest children [were] potential[ly] witnesses." DFPS officials also believed that the children "may [have] be[en] at a risk of harm due to [T.H.L.] and [R.A.L]'s history of violent behavior."

---

[7] D.J. was the father of C.J. and C.C.J. Atkins testified that D.J. had been previously convicted of the offenses of possession of marijuana in 2008; assault causing bodily injury in 2003; "[f]ictitious [c]ounterfeit [i]nspection" in 2001; resisting arrest, driving with a suspended license, and "fictitious or counterfeit inspection" in 1999; and resisting or evading arrest in 1985.

[8] Atkins testified that R.A.L. had been previously convicted of the offenses of terroristic threat and forgery of a financial instrument in 2009.

During Atkin's investigation, T.H.L. told him that on the night that D.J. was murdered, he had been "acting like he was worried about something" and said that he "had something heavy to tell her." D.J. and T.H.L. then drove to a daycare facility to pick up C.J. around 9:00 p.m. As T.H.L. was backing her car out of the facility's parking lot, "a car pulled up and tried to block her in [her] parking spot. [Two] black males were in the car and the passenger got out of the car and . . . opened the trunk of the car." D.J. then told T.H.L. "to go, go, go[,]" and she was able to back out and drive out of the parking lot. At the time, D.J. seemed agitated.

When they returned to T.H.L.'s house, D.J. spent time talking and texting on his cellular telephone. At 10:00 p.m., D.J. told her "what was going on." Specifically, "someone had shot at his daughter . . . earlier in the evening and . . . a gang called 44 was trying to kill his son . . . and daughter." D.J.'s son "had killed a boy" and "the boy[']s gang" was seeking revenge. At about 1:30 a.m., D.J. told T.H.L. that "he was going to deal[] with [everything] in the morning and go get a gun." He then went to the bedroom and to sleep. Because her mother was staying at her house, T.H.L., who was "freaking out," decided to go "for a drive to clear her head." She drove to a "small lake near her house to think," and when "it started to get light" outside, she "went to Walmart to get breakfast for the children." T.H.L. returned home around 6:00 a.m., noting that the gate to the side of her house and the door to the garage were open. She proceeded to her bedroom and stopped in the

4

doorway when she saw blood on the bed. T.H.L. then went upstairs to get her mother to ask her "to go check the room"; however, her mother was "too afraid." R.C. then "said [that] she would go and went down stairs." R.C. returned with C.J. and told T.H.L. that D.J. was in the bed and bleeding.[9]

In regard to T.H.L. and R.A.L.'s relationship, Atkins testified that R.A.L. told him that T.H.L. had once stabbed him. R.A.L. also acknowledged that in 2009 he was arrested for the criminal offenses of forgery and terroristic threat. In regard to the terroristic threat, R.A.L. had telephoned T.H.L. and told her that "he was going to put her and her mother in an oven." He also acknowledged a history of domestic violence. And Atkins noted that T.H.L. and R.A.L.'s relationship appeared to be "very cozy."[10]

Atkins further testified that R.C. told him that R.A.L. was "very mean" to her and "treat[ed] her like trash." He would "yell[] and scream[] at her" and "verbally abuse[] her." And she did not feel safe around him. R.C. also said that she did not "want to go back with her mother" and did not feel safe with her.

DFPS caseworker Gianna Robinson testified that it is in the children's best interest to have DFPS as their permanent managing conservator and not be returned

---

[9]     Atkins also noted that T.H.L.'s mother told him that T.H.L. had refused to retrieve C.J. from the bedroom.

[10]    Although T.H.L. told Atkins that she was not in a relationship with R.A.L., they were "good friends" and had "a very good working relationship."

5

to T.H.L. Robinson noted that R.C. is sixteen years old and doing well in a foster home. While in her foster home, R.C. has been thriving, her school grades have improved, and she has a part-time job. R.C. wants to go to cosmetology school, and her foster mother is willing to have R.C. remain in her home. R.C. participates in individual therapy and has supervised visits with T.H.L. R.C. told Robinson that, although she would like her visits with T.H.L. to remain supervised, she does want to continue to have contact with her. Notably, R.C. feels that it is best for her to stay in her foster home, where she feels safe and comfortable, and believes that she is "growing." And Robinson explained that there have been allegations of abuse of R.C. by her father, R.A.L.

R.L. is twelve years old and doing well in a foster home with his brother, C.J. R.L. is doing well in school, is involved in band, and plays football and basketball. He is comfortable and happy in his current placement and participates in family therapy. Although Robinson recommends that R.L.'s visits with T.H.L. be supervised, she noted that R.L. and T.H.L. have a loving relationship, he is not afraid of T.H.L., and T.H.L. brings him food at visits.

C.J. is four years old and doing well in a foster home with his brother, R.L. C.J. attends daycare and engages in activities with R.L. C.J. also participates in family therapy, and Robinson recommends that C.J. have supervised visits with T.H.L.

C.C.J. is two years old and doing well in a "relative home" with her aunt, D.J.'s sister. She participates in gymnastics and dance. Robinson recommends that C.C.J. have supervised visits with T.H.L., noting that over the last four months, T.H.L. had had three visits with C.C.J.

In regard to T.H.L., Robinson explained that DFPS hopes to continue to work with her on her coping skills and "managing everything," including "how she interacts w[ith] the children." T.H.L. wants the children returned to her, and she participates in individual and family therapy with the children. However, T.H.L. has not demonstrated "parenting skills" or "coping skills" during her visits with the children. T.H.L. successfully completed her individual therapy, her parenting classes, and all of the services required by her Family Service Plan ("FSP"), except family therapy. However, Robinson explained that the children should not be returned to T.H.L. because she has not yet completed family therapy and there is an "open investigation" of D.J.'s murder.[11] Robinson is also concerned about the "safety and the environment of the children" should they be returned to T.H.L. And she noted that the children's therapist does not recommend that they be returned to T.H.L.'s home.

Noting that T.H.L. lives in a small apartment, Robinson is also concerned about the sleeping arrangements that T.H.L. has made for the children. If the

---

[11]     Robinson stated that T.H.L. is "a suspect in the case."

children were to be returned to T.H.L., R.C. and C.C.J. would share a bedroom, while T.H.L. and her "[g]odmother" would share the other bedroom. Because R.L. and C.J. would have to sleep in the living room "right there by the front door," C.J. "could just get up and walk out the door." And because T.H.L.'s home contained "fruit flies" and R.C. has previously witnessed an altercation in the home between T.H.L. and R.A.L., Robinson expressed her concern about "the safety of the home," the prior "home violence," and the domestic violence that has occurred between T.H.L. and R.A.L.

Nikia Wingard, who was previously the DFPS caseworker for the children, testified that she was involved with the children for three years, and T.H.L. was "very uncooperative, angry, blam[ed] [DFPS] for everything," and "never took responsibility for anything." Although her poor attitude remained unchanged, T.H.L. did complete the requirements of her FSP.[12] Wingard noted that T.H.L. loves her children, wants them returned to her, and is employed and financially able to care for the children. When the children came into DFPS's care, they were healthy, "good kids," who had a bond with T.H.L. T.H.L. acted appropriately during her visits with C.C.J., and the children appear happy to see T.H.L. at their visits.

---

[12] Wingard noted that narcotics use was not an issue for T.H.L. and she was not intoxicated when she came to visit the children. T.H.L. also does not have a criminal history.

8

However, Wingard opined that T.H.L. would be a danger to her children, was not "a constant" in their lives after DFPS took custody of them, could not be relied upon, was not consistent, and did not "abide by the rules and regulations" of DFPS. Wingard expressed her concern about T.H.L.'s ability to protect the children and keep them safe, and she opined that there would be a risk of emotional or physical danger to the children if they were returned to T.H.L. Wingard averred that T.H.L. is dishonest and has engaged in certain acts and omissions that "may indicate that the existing parent/child relationship is not proper or is not in the best interest of the children," such as not being cooperative or protective of the children. And over the course of this case, Wingard has not seen any "growth and development" on the part of T.H.L. She opined that T.H.L. cannot meet the needs of the children and it is in their best interest that they remain in their current placements. And Wingard noted that D.J.'s murder remains unsolved.

Wingard further explained that right after DFPS took custody of the children, it placed them with T.H.L.'s mother. However, after one week, it removed the children from her care because T.H.L. violated DFPS's rule that she not have contact with the children. DFPS then placed the children in a foster home together.[13] However, while the children were in this new placement, T.H.L. "sneaked" R.C. an

---

[13] From the record, it appears that C.C.J. had not yet been born at this time.

iPod[14] device during a visit and then "contact[ed]" R.C. using the iPod "while [R.C.] was in the foster home." T.H.L. then encouraged R.C. to use the iPod, which violated DFPS's rules and caused problems in R.C.'s foster home.[15] And R.C. had to be removed from the placement because of the incident with the iPod. Other actions by T.H.L. also caused R.L. and C.J. to be removed from the foster home. Although the trial court subsequently ordered T.H.L. to have no contact with the children, she "continue[d] to communicate" with R.C., "even though there [was] a no contact order."

Currently, R.C. lives in one foster home, while R.L. and C.J. live together in a separate foster home. Wingard noted that R.C. is not with her brothers because of T.H.L.'s "disruptive[ness]." Wingard explained that T.H.L. gave birth to C.C.J. during the pendency of this case and has visited her. However, T.H.L. has not attended every visit, not always arrived on time, and provided excuses only "[s]ometimes." There was also a "period of time when [T.H.L.] just failed to visit for several weeks."[16]

---

[14]     The terms "iPod" and "iPad" are used interchangeably throughout the record. For clarity, we refer to the device as an "iPod."

[15]     Wingard testified that T.H.L. told R.C. to call "the 1-800-number for [DFPS]" and report that C.J. "ha[d] bruises and all" while the children were in the foster home. Wingard, however, noted that there was no evidence that C.J. had been abused. And R.C. told T.H.L. that she was not allowed to talk to her.

[16]     Wingard also testified that T.H.L. was involved in an incident in which she followed C.C.J.'s foster parent, causing C.C.J.'s initial foster placement to breakdown.

At one point, DFPS had "a plan in place to [re]start contact between [T.H.L.] and the children." Initially, T.H.L. was to write letters to the children, and then she would eventually have "[tele]phone contact" with them. Wingard explained that the children did not write back to T.H.L. and the "[tele]phone contact" did not occur because their therapist had concerns about T.H.L.'s behavior.

Wingard further noted that before DFPS took custody of the children, R.C. had taken on a "parenting role" with her younger siblings that was not age appropriate. R.C. was traumatized, confused, and hurt by the events surrounding D.J.'s murder. However, R.C. is now doing "[w]onderful[ly]," is happy, wants to work, "knows what she wants," and is "looking towards her future, making future goals." She wants to stay with her foster mother, who provides her with transportation to and from her various activities. And Wingard opined that her placement will be able to meet her future emotional and physical needs. Wingard also noted that during the pendency of this case, T.H.L. told R.C. that R.A.L. is her biological father, even though R.C. had spent her entire life believing that another man was her father. R.C. was shocked, surprised, and not "too happy about the information."

Wingard also testified that R.L. is doing "very, very good," although he "[s]truggl[ed]" when DFPS first took custody of him. Initially, R.L. was confused, had "mixed emotions," and "really didn't understand what was going on." Now, he

11

is "outgoing, active, happy, more talkative," "listens more," and is "a totally different person from the beginning" of the case. C.J. is also happy, outspoken, talkative, and bright. And he and R.L. get along well and want to remain in their current placement. Wingard opined that it is in the best interest of R.L. and C.J. to remain together, and their current placement will meet their future emotional and physical needs. Their foster parents, who provide them with transportation and equipment needed for their various activities, are committed to helping them excel and taking care of their needs.

C.C.J. is also doing well in her placement. And Wingard opined that it is in her best interest to remain in her current placement with her aunt, who is able to meet her future emotional and physical needs.

According to Wingard, the children's respective placements are protective and meet their needs. Their caregivers are caring, communicate well with them, discipline them, and ensure that they remain active. The caregivers have also availed themselves of programs to assist them and promote the best interest of the children. For instance, R.C. has "consistent therapy inside the home" and with DFPS, participates in the Preparation for Adult Living Skills program, attends tutoring when needed, and is allowed to work. R.L. is involved with mentoring, basketball, and "one-on-one" intervention with a coach at his school. And C.J. is in an

12

after-school program that "expose[s] [him] to other children," as is C.C.J. Each placement is stable, and DFPS desires permanency for the children.

John Chapman testified that three years prior to trial, when he was a DFPS investigator, he went to T.H.L.'s purported residence to locate C.C.J., who was an infant, after T.H.L. "would not produce the child." Upon his arrival, he saw evidence that C.C.J. had been at the home, but R.A.L., who was present, told him that T.H.L. had taken C.C.J. to Louisiana. Chapman then called T.H.L.'s cellular telephone number, and she stated that she was "on the road" to Louisiana and "in the area." (Internal quotations omitted.) Chapman later learned, however, that T.H.L. was not on her way to Louisiana, but actually in a meeting with her caseworker at the DFPS office. After T.H.L. later agreed to meet Chapman to let him see C.C.J., she arrived without the child. T.H.L. then subsequently returned with C.C.J. and took her out of her car. However, when law enforcement officers arrived, T.H.L. "grabbed the baby," "jumped in" the front seat of her car, shut the door, and "attempted to take off" with C.C.J. in her lap. T.H.L. finally gave C.C.J. to Chapman, and he served her with a "Notice of Emergency Removal."

Chapman opined that T.H.L. was untrustworthy and "willing to do whatever she needed to do to continue to deceive [DFPS]." He stated that T.H.L. was "a flight risk," who had family and friends, including R.A.L., who were willing to help her mislead DFPS.

13

Sharon Boutwell, a volunteer with Child Advocates Inc. and the child advocate for R.C., R.L., and C.J., testified that it is in the children's best interest to remain in their current placements and for DFPS to be named their permanent managing conservator. She also recommended that T.H.L. have supervised visits with the children through a family therapist[17] and the children not have visits with R.A.L., unless first approved by a therapist. In making her recommendations, Boutwell considered the desires of the children.

Boutwell noted that R.C. participates in individual and family therapy. Although R.C. was "quiet at the very start" and took "a long time to build up trust," she is now outgoing, expressive, and "very pleased with how her junior year was going to start in high school." R.C. is also "more focused" and "able to tell you what she wants for herself and for her future." She has worked with her therapist on "some of the concerns that she had when she entered into foster care . . . [related] to having been in a situation where there was a murder." R.C. continues to work on issues related to R.A.L. and "talking to her mom." She and her foster mother have a strong relationship, and if R.C. were returned to the care of T.H.L., Boutwell is concerned about her health, safety, and welfare, especially about her moving backward in the progress that she had made so far.

---

[17] Boutwell noted that the children began having family visits with T.H.L. in December 2015, and at the time of trial, they had had five visits.

14

R.L. participates in individual and family therapy, is on the quiet side, is an "outstanding athlete," and loves being with his foster mother's son. Boutwell opined that R.L. has bonded with his foster mother, and together, the foster mother and father, their son, R.L., and C.J. "feel[] like [a] family." C.J. participates in family visits and is a "very industrious" child. He has a strong vocabulary, does his homework, and is "able to work within the structure of understanding rules and consequences." Boutwell is concerned about R.L. and C.J. being returned to T.H.L., especially because C.J. has "no relationship" with T.H.L. and does not know her well.

Boutwell further testified that Child Advocates is concerned about T.H.L.'s "patterns of behavior," including her "not seeing the inappropriateness of some of the individual males that she has been with" and the frequency with which she "chang[es] jobs." Boutwell noted that T.H.L. still has a relationship with R.A.L., who has been involved with her in physical and domestic violence that the children have witnessed, and T.H.L. associates with individuals with criminal histories. And although T.H.L. has a "desire to understand" her children, she is not capable of "understand[ing] what the children have actually experienced as a result of their involvement in a home [in which] a murder" occurred. In other words, T.H.L. is not able to "see things through the eyes of the children." She has also exhibited a lack of "follow-through" with the children and an inability to "associate with the children

15

and their needs." Boutwell opined that T.H.L. has not been truthful, does not have the judgment necessary to raise the children in a safe environment, and lacks the ability to "provide a protective home for the[] children."

Boutwell did explain that although the children initially had reservations about their visits with T.H.L., they have gradually gotten better. The children are "good kids," they were raised appropriately, and they are not disrespectful. And there is no evidence that T.H.L. has ever injured them. However, Boutwell is concerned about the emotional harm that R.C. suffered when she entered the bedroom where D.J. had been murdered.

Dwayne King, a volunteer with Child Advocates, testified that he is the child advocate for C.C.J., who is currently in a "kinship placement." He recommended that she remain in her current placement and DFPS be appointed her permanent managing conservator. King opined that this is in the best interest of C.C.J. because she is closely bonded with her caregiver. Returning C.C.J. to T.H.L. is not in her best interest because it "would place [her] in danger," both physically and emotionally. King noted that C.C.J. currently is happy, playful, healthy, and "developmentally on track."

King further expressed concern that T.H.L., in the past, had allowed "unsafe circumstances" to exist in her home. He noted that the murder of D.J. occurred in T.H.L.'s home and she has allowed "unsafe men . . . to be a part of her life." T.H.L.

16

had also engaged in "[s]chemes of misrepresentation and fraud that w[ere] connected with the children or . . . involved the children." King opined that if returned to T.H.L., the children would be exposed to physical danger and "circumstances that are unsafe for them in terms of their emotional condition." And King noted that T.H.L. has "made decisions both before and during the case that are unwise and imprudent and reflect poorly on her parenting capability."

King did acknowledge that the children should have visits with T.H.L., but they should be supervised. There is no evidence that T.H.L. ever abused C.C.J. And King opined that C.C.J. could develop an appropriate relationship with T.H.L. Nevertheless, he believes that the appointment of T.H.L. as C.C.J.'s permanent managing conservator would "significantly impair the child's physical health and emotional development."

Leon Curtis Riggins, who has been incarcerated in the Harris County Jail since March 2016 for the felony offenses of possession of a controlled substance and "possession of a weapon," testified that he and T.H.L. have been friends for "two or three years" and he had "helped her out from time to time." Riggins had previously been convicted of the offenses of possession of a controlled substance, possession of marijuana, "felony theft," "felony possession of a weapon," "unlawful carrying of a weapon," and "assault on a family member." Riggins explained that he was T.H.L.'s boyfriend at some point after DFPS removed the children from T.H.L., they

17

engaged in a sexual relationship until January 2016, and she visited him in jail in 2016. Riggins admitted that he had previously been "ordered to register as a sex offender" and he engaged in illegal activities during his relationship with T.H.L. Although he did not meet the children, T.H.L. had told him about them and he had seen a photograph of them.

R.A.L. testified that although he is the father of R.C. and R.L., he did not know that R.C. was his daughter until 2013 and she did not know that he was her father until DFPS initiated this case. Nevertheless, T.H.L. and R.A.L.'s 2011 divorce decree, which the trial court admitted into evidence, identifies R.A.L. as R.C.'s biological father. R.A.L. admitted that he and T.H.L. did not tell R.C. that she was his child until 2013, it was not fair to R.C. to not know the identity of her father, and he would expect her to be upset and have resentment toward him. And the fact that T.H.L. had previously told R.C. that her biological father was another man could have negatively affected R.C.'s well-being.

R.A.L. further noted he and T.H.L. were married from 2003 to 2011, and during their marriage, they engaged in "physical altercations." Once, T.H.L. stabbed him several times. On another occasion, while he was driving in a car with T.H.L., R.C., and R.L., T.H.L. stabbed him with a pencil in his leg and in his back. However, since their divorce, R.A.L. and T.H.L. have maintained a friendship and co-parented the children.

18

R.A.L. admitted also that he has a criminal history, consisting of convictions of the offenses of "[f]orgery and misdemeanor terroristic threat," which he made against T.H.L. And during the pendency of the instant case, R.A.L. got into a verbal argument with a DFPS supervisor outside the courtroom. He was later arrested for "felony retaliation" related to that incident, and T.H.L. "bailed [him] out."

In regard to the murder of D.J., R.A.L. admitted that it was not appropriate for a thirteen-year-old child to see a murder scene or for T.H.L. to leave C.J. in his crib in the room where D.J. was murdered. R.A.L. also recalled an incident in which D.J., prior to his death, either "touched [R.C.] in an inappropriate way on her backside" or "made a verbal sexual comment" toward her.

In regard to T.H.L. and the children, R.A.L. noted that T.H.L. took good care of them and they were properly fed and bathed. She appropriately disciplined the children and is loving toward them. T.H.L. financially supported the children prior to DFPS taking them from her, and she has done her best to protect them. R.A.L. does not want R.C. and R.L. to remain in foster care, and he opined that it is in their best interest to be with T.H.L. She has done everything that she can to have the children returned to her care, including completing the requirements of her FSP. The children have a bond with T.H.L., and R.A.L. opined that R.C. wants to have a relationship and live with her mother.

19

R.A.L. further testified that he had previously seen T.H.L. and Riggins "out" together, including driving around late at night, and Riggins "would come to [T.H.L.'s] house." R.A.L. believed that T.H.L. and Riggins were "involved," and he last saw them together in either December 2015 or January 2016. R.A.L. was concerned about T.H.L.'s decision to have a relationship with Riggins because of his criminal history involving "weapons and drugs." And he would be concerned if R.C. and R.L. "returned to a family unity involving Mr. Riggins" because of Riggins's background. However, R.A.L. did not believe that Riggins had been around the children.

R.C.'s foster mother testified that DFPS placed R.C. in her home in October 2013 and R.C. is the only foster child in her care. R.C. was at first quiet, withdrawn, and "very to herself," and she did not like to communicate with other people because she had experienced an emotional trauma. She also had nightmares and difficulty with sleeping. Nevertheless, R.C. was a respectful, kind, and healthy child. R.C. is now outgoing, happy, and excited. She is "planning for her career and . . . trying to stay focused so she can get her plans to materialize." R.C. wants to stay in her current placement, and her foster mother wants her to stay in the home, where she has stability. Moreover, R.C.'s foster mother wants to remain a part of R.C.'s life even after she becomes an adult.

R.C.'s foster mother ensures that she is taken care of, providing her with housing, transportation to and from school and appointments, and the "amenities that she needs for her life." R.C. is currently on medication that is monitored. She attends high school and a vocational facility after completing her "four core classes" at school each day. She earns "As and Bs" in school and obtains tutoring when needed. While in foster care, R.C. benefitted from participating in the Preparation for Adult Living Skills program. R.C.'s goal is "to have a cosmetology license when she finishes high school, and she intends to go on to college and use her cosmetology license as a backup for her to make sure that she always has money." Her foster mother, who is home when R.C. returns from school each day, approves of R.C.'s goals. And for the future, R.C.'s foster mother hopes that R.C. will "stay on course" and continue "preparing [herself] for being a successful adult." Her foster mother opined that it is in R.C.'s best interest to remain in her current placement.

R.C.'s foster mother further testified that R.C. has maintained contact with her siblings, visiting them at least once a month and meeting them and their foster families at other events and celebrations. For instance, R.C. attended C.C.J.'s birthday celebration, along with her other siblings. R.C.'s foster mother understands that R.C. has a relationship with T.H.L., is likely to have visits with T.H.L., and she is willing to do whatever the trial court orders in regard to visitation. R.C.'s foster mother noted that R.C. does want to have contact with T.H.L., and her foster mother

21

is comfortable with R.C. contacting T.H.L. To her foster mother's knowledge, R.C. has not expressed any fear about being unsupervised with T.H.L.

The foster mother of R.L. and C.J. testified that DFPS placed the brothers in her care in August 2014 and they live with her, her husband, and her son, who is fifteen years old. R.L. and C.J. get along well with the foster mother's son, they play basketball together, and the family is excited and delighted to have R.L. and C.J. living with them.

When R.L. and C.J. first came into their foster home, the brothers were withdrawn, had trust issues, and were nervous. R.L.'s previous grades were fair, but R.L. and C.J. did "appear to have had some parenting," listened, and were polite. Currently, R.L. and C.J. appear to be happy, and their foster mother tells them that they are "good children." R.L. is doing "[v]ery well" in school, and he participates in football, basketball, and the drill team. His foster mother takes him to school and picks him up from a bus stop after school. She also pays for the uniforms that he needs for his activities. C.J. is doing well "Pre-K4" and enjoys school.

R.L. and C.J.'s foster mother further testified that they have adjusted well to living in the home, and "everybody gets along." The foster mother is "willing to keep the boys until they age out," and R.L. and C.J. are in agreement with her plan, as are the other members of her family.

C.C.J.'s aunt, who was D.J.'s sister, testified that she, as of the date of her testimony, had been C.C.J.'s caregiver for nine months. C.C.J. visits with all of her siblings twice a month and sees C.J. "more frequently." C.C.J. also has visits with T.H.L. C.C.J.'s aunt, who wants C.C.J. to remain with her until C.C.J. is eighteen years old, is comfortable with T.H.L. continuing her visits with C.C.J. C.C.J.'s aunt is also willing to do what is required of her "to make sure that the relationship between [T.H.L.] and [C.C.J.] is not lost." C.C.J.'s aunt did note that after visits with T.H.L., C.C.J. appears stressed mentally and emotionally, but "[a]fter a day or so," C.C.J. falls back into her regular routine.

In regard to D.J.'s murder, C.C.J.'s aunt testified that no one has been arrested and the investigation remains ongoing. She also noted that D.J. had a criminal conviction for "crossing state lines with drugs."

Having known T.H.L. for six or seven years, C.C.J.'s aunt opined that T.H.L. is untrustworthy, and she does not feel safe interacting with T.H.L. She further explained that T.H.L., who had previously been employed by a home healthcare provider, asked D.J.'s mother "to sign up for the home healthcare for her agency, so that she would be able to provide healthcare for her." After D.J.'s mother signed up with T.H.L.'s agency, T.H.L. did not "show up" to provide the home healthcare. C.C.J's aunt also noted that during a period of time when D.J.'s mother was receiving "food stamps," T.H.L. asked her to "increase the [amount of] food stamps

23

that she was receiving" by stating that R.C. and R.L. lived in the mother's home. In fact, R.C. and R.L. did not live with D.J.'s mother at the time, and T.H.L. received the extra aid. Thus, C.C.J.'s aunt is concerned that T.H.L. may "coerce[]" the children into "do[ing] things that are not legal" or "doing things that they're not supposed to do." C.C.J.'s aunt also noted that T.H.L. at times has not been attentive to her children.

In regard to C.C.J., her aunt testified that she, at two and a half years old, is walking, running, jumping, and tumbling. She is potty trained, happy, healthy, smart, "knows that she's loved," and "likes lots of attention." C.C.J. will begin "a pre-K 3 program," an "advanced program at the private school that she's attending." And she participates in gymnastic classes. C.C.J.'s aunt has family support, and C.C.J. has "lots of siblings" on her father's side. She does not currently attend individual therapy, but C.C.J.'s aunt believes that it may be beneficial in the future.

T.H.L. testified that before D.J. was murdered, they had been in a relationship for three or four years and they were engaged and living together. She acknowledged that D.J. had a criminal history and was not the type of person that she would want around her children. T.H.L. explained that on the day of D.J.'s murder, they had driven to a daycare facility to pick up C.J. After they put C.J. in the car, D.J. "look[ed] [around] at [their] surroundings," and while acting troubled and disturbed, told her "real quickly, hurry up, hurry up, back up, back up." T.H.L. then saw a

24

white car behind her, and when she "swerve[d]" her car out of its way, the white car drove off and "peel[ed] out." She was scared, and D.J. told her to "keep going" and that he would explain everything when they got to T.H.L.'s house.

After they arrived at T.H.L.'s house, she helped the children get ready for bed. And D.J. stayed in the garage and made calls on his cellular telephone for several hours. At the time, T.H.L.'s mother, R.C., C.J., and a foster child,[18] who was in T.H.L.'s care, were also in the house.

At around 10:00 or 11:00 p.m., D.J. told T.H.L. that one of his daughters, who was involved in a gang, had been "shot at at her apartment complex" earlier that day and one of his sons was in trouble because he had "killed a drug dealer." D.J. believed that he was "in trouble" and thought that he had recognized one of the men in the white car at the daycare facility. D.J. explained that earlier in the day, he had gone to "confront some of the guys that his son" had "an issue with." And he had called his other family members to tell them that he thought that they were not safe. T.H.L. noted that it was "not clear" as to whether "these people" knew where she and D.J. lived and she was afraid for the safety of herself and D.J. T.H.L. then decided that she "need[ed] to leave" to "digest" all of the information and clear her mind. She left the house sometime after midnight and drove to a lake in the

---

[18] Although the foster child was under T.H.L.'s care in her home at the time of D.J.'s murder, T.H.L. did not report the murder to her foster agency. Nor had she informed the agency that D.J. had been living in the home.

neighborhood to talk to a friend on her cellular telephone. T.H.L. then drove around "aimlessly." And at about 3:00 or 4:00 a.m., she went to a store to "pick up some things for the [children's] dentist appointment[s]" in the morning.

T.H.L. returned to her home as the sun was rising, noting that the gate to her home was open and her back door was ajar. When she went inside her house and into her bedroom, she saw D.J. "across the bed" and a blood stain. Although C.J. was in his crib in the bedroom, T.H.L. panicked and ran upstairs to find her mother, who was sleeping in a room with R.C. T.H.L. told her mother what she had seen and asked her to go downstairs to retrieve C.J. R.C., however, "went into . . . adult mode" and said that she would retrieve C.J.

Later, once law enforcement officers had arrived, T.H.L. asked her mother to take the children to a cousin's house. T.H.L. then left to go see her father in Louisiana for the weekend, and the children were not happy that she had left them. When she returned to Houston, T.H.L. went "[s]traight" to a motel, where she lived for approximately two months. She also went to check on the children who were still at her cousin's house. A week after D.J.'s murder, DFPS contacted T.H.L.

T.H.L. further testified that she does not have a criminal history and did not murder D.J. She admitted that she should have "waited a little longer" before allowing D.J. to move into her home. And she noted that an allegation had arisen that D.J. had inappropriately touched R.C. R.C. had told T.H.L. that D.J. had

26

"tapped her on her leg." But to T.H.L.'s knowledge, there was nothing sexual about the incident. T.H.L. also admitted that R.C. had been traumatized by what she had seen in regard to D.J.'s murder.

T.H.L. also explained that she had a "bad attitude" toward DFPS after it took custody of her children. She admitted that she had not been cooperative with DFPS. Indeed, at some point, things became "really ugly" verbally between a DFPS investigator and herself. And T.H.L. admitted that while R.C. was in a foster home, she placed an iPod in a bag that she gave to R.C. so that she could communicate with her. However, she did not know that doing so violated any DFPS rules.

T.H.L. stated that after R.C. had reached out to a cousin using the iPod, the cousin told T.H.L. that C.J. "ha[d] marks on him." T.H.L. then panicked, and she and R.C. began sending messages back and forth. In one message, T.H.L. told R.C.: "The number is 1800252 5400 an say [C.J.] has bruises an yall in foster care[.]" Although T.H.L. at one point testified that she did not tell R.C. to make false allegations of abuse, she also explained that she felt that it was best to tell R.C. "to lie to [DFPS] about abuse." In another message. T.H.L. told R.C.: "Please dont tell [DFPS] how u feel about [R.A.L.]..they think u r scared of him." T.H.L. noted that at the time, R.C. believed that R.A.L. was her step-father, rather than her biological father, and they had tensions in their relationship. And T.H.L. believed it appropriate to tell R.C. to not tell the truth.

27

In another message, T.H.L. told R.C.: "We went to court today . . . do not tell them we have been talking this way[.]" T.H.L. acknowledged that she had told R.C. what to say to the trial court, messaging R.C.: "We go back to court on Sept 18th. So that the judge will know what you and [R.L.] have to say let them know you want to come home to Mom"; "The attorney is going to tell the judge everything you say make sure you say good things so y'all can come home"; "Tell the attorney also [C.J.] is not having a good time in foster care"; and "If you say bad things they will continue to keep you and that place[.]" Further, T.H.L. intended R.C. to erase all of her messages, say that she did not have any social media accounts, and email her from school if necessary. And T.H.L. admitted that her communications with R.C. could have affected R.C. emotionally. In response to communications with R.C. "in secret," T.H.L. acknowledged that the trial court had issued a "no-contact order," which had not been lifted. And T.H.L. admitted to speaking with R.L. by telephone when she was not allowed to do so.

In regard to her relationships with men, T.H.L. testified that although she did not have an emotional relationship with Riggins, she did have sex with him on one occasion. She visited Riggins five times while he was incarcerated, acting as a mediator between him and his family, and he had asked her to "bond him out." T.H.L. admitted that she should not have had any sort of relationship with Riggins and knew "he was a felon."

28

T.H.L. further admitted that she had maintained a relationship with R.A.L., to whom she was once married. During their marriage, violence occurred and there were two "stabbing incident[s]," during which she injured R.A.L. And the children were present during one of the incidents. T.H.L. explained that R.A.L. was not in a "good mood" and they had a discussion in front of the children. They then went to a bedroom and into a closet because R.A.L. was speaking loudly. While in the closet, R.A.L. threatened T.H.L. and put his hand around her throat. She then "picked up . . . [a] hanger" and "poked him" to get him off of her. Since their divorce, however, they have calmed down and co-parent together. T.H.L. acknowledged that that R.A.L. "represents some kind of concern for the health, safety, and welfare" of the children and she would like him to stay "far away from the house . . . until [R.C.] gets more comfortable being around him." According to T.H.L., the relationship between R.C. and R.A.L. is not "the best."

In regard to her current living conditions, T.H.L. testified that she lives with her "godmother" in a 1200 square-foot, two-bedroom apartment. If the children were returned to her, C.C.J. would sleep in a "toddler bed" in T.H.L.'s bedroom, while R.L. and C.J. would sleep on a sofa. T.H.L. does not "really have

arrangements for [R.C.]," but she could share a bed with T.H.L. as they had done in the past.[19]

T.H.L. is currently employed as a school bus driver, but she is only working part-time and cannot obtain full-time employment until after this case comes to completion. After D.J.'s death, she received $100,000 in proceeds from a life insurance policy, and $75,000 remained at her disposal after she paid certain expenses. At the time that she received this money, the children were no longer living with her. Although T.H.L. brought the children gifts at their first and second visits, she did not provide any financial support while the children were in the care of DFPS. And she spent the remaining $75,000 in ten months. T.H.L. did state that she has clothing and bedding available for the children if they are returned to her care, and she has purchased a car for R.C.

T.H.L. noted that when the children were previously in her care, they were fed and safe in her home. She knew their teachers and helped them with homework. T.H.L. opined that it is better for the children to be returned to her, rather than to remain in foster care, because she is a "humanitarian" and "wouldn't do anything to harm [her] kids." She loves her children, she has empathy for them, her life has no meaning without them, and she is healthy.

---

[19]     T.H.L. also testified that during the trial, she had signed a new lease agreement and would be moving in a few months.

30

T.H.L. admitted that she had received "food stamps," using D.J.'s mother. She noted that her children were not living with D.J.'s mother, and she did not need the "extra food stamp money" that she had received. Nevertheless, she did ask D.J.'s mother to "sign up for it." T.H.L. also noted that she did provide D.J.'s mother with home healthcare, and contrary to the testimony of other witness, T.H.L. did not miss any visits. She also admitted that she had claimed the children on her federal income tax returns even though she did not have custody of the children at the time that she did so.

In regard to her FSP, T.H.L. testified that she signed it and believes that she has done everything that DFPS has asked her to do. She was successfully discharged from individual therapy, completed parenting classes, and completed the requirements of her FSP.

## Standard of Review

The standard of review for the appointment of a non-parent as sole managing conservator is less stringent than the standard of review for the termination of parental rights. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.). Unlike the standard of proof for the termination of parental rights, the findings necessary to appoint a non-parent as sole managing conservator need only be established by a preponderance of the evidence. *In re J.A.J.*, 243 S.W.3d at 616; *see* TEX. FAM. CODE

31

ANN. § 105.005 (Vernon 2014). Moreover, we review a trial court's appointment of a non-parent as sole managing conservator for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d at 616; *Earvin v. Dep't of Family & Protective Servs.*, 229 S.W.3d 345, 350 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Accordingly, we will reverse a trial court's appointment of a non-parent as sole managing conservator only if we determine that it is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d at 616; *Earvin*, 229 S.W.3d at 350. We view the evidence in the light most favorable to the trial court's decision and indulge every legal presumption in favor of its judgment. *Earvin*, 229 S.W.3d at 350. A trial court abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). However, an abuse of discretion does not occur if the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002); *In re S.T.*, 508 S.W.3d 482, 490 (Tex. App.—Fort Worth 2015, no pet.).

When applying an abuse-of-discretion standard, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error but are factors used in assessing whether the trial court abused its discretion. *Mai v. Mai*, 853 S.W.2d 615, 618 (Tex. App.—Houston [1st Dist.] 1993, no writ); *see also McGuire v. McGuire*, 4 S.W.3d 382, 387 n.2 (Tex. App.—Houston [1st Dist.] 1999,

32

no pet.) (sufficiency challenges incorporated into abuse of discretion determination). To determine whether a trial court abused its discretion because the evidence is legally or factually insufficient to support its decision, we consider (1) whether the trial court had sufficient evidence upon which to exercise its discretion and (2) whether it erred in its application of that discretion. *Bush v. Bush*, 336 S.W.3d 722, 729 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *see also Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied). We conduct the applicable sufficiency review when considering the first prong of the test. *Bush*, 336 S.W.3d at 729; *see also In re S.T.*, 508 S.W.3d at 489. We then determine whether, based on the evidence, the trial court made a reasonable decision. *In re S.T.*, 508 S.W.3d at 489; *Moroch*, 174 S.W.3d at 857.

In a legal-sufficiency review, we consider all of the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not disregard it. *Id.* at 827; *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007, no pet.). The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 819.

The final test is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

In a factual-sufficiency review, we consider all the evidence for and against the challenged finding and set it aside only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). In a bench trial, the trial court is the sole judge of the credibility of the witnesses. *Sw. Bell Media, Inc. v. Lyles*, 825 S.W.2d 488, 493 (Tex. App.—Houston [1st Dist.] 1992, writ denied).

### Permanent Managing Conservatorship

In her sole issue, T.H.L. argues that the trial court erred in appointing DFPS as the children's permanent managing conservator because the evidence is legally and factually insufficient to establish that appointment of T.H.L. as the children's managing conservator would significantly impair their physical health and emotional development. *See* TEX. FAM. CODE ANN. § 153.131(a) (Vernon 2014), § 263.404(a) (Vernon Supp. 2016).

A managing conservator is a person or entity who, by court order, has been awarded custody of a child and may determine the child's primary residence. *See Phillips v. Beaber*, 995 S.W.2d 655, 660 (Tex. 1999); *In re C.A.M.M.*, 243 S.W.3d 211, 215 n.7 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also* TEX. FAM. CODE ANN. § 153.132 (Vernon 2014) (listing "rights and duties" of parent

34

appointed sole managing conservator), § 153.371 (Vernon Supp. 2016) (listing "rights and duties" of non-parent appointed as sole managing conservator). The managing conservator has nearly sole authority to make decisions for the child. *See* TEX. FAM. CODE ANN. §§ 153.132(1)–(9), 153.371(1)–(11); *see also In re N.L.D.*, 412 S.W.3d 810, 816 (Tex. App.—Texarkana 2013, no pet.) ("Conservatorship of a child includes the day-to-day management of the child.").

The primary consideration in determining issues of conservatorship and possession of and access to a child is always the child's best interest.[20] *See* TEX. FAM. CODE ANN. § 153.002 (Vernon 2014); *In re J.A.J.*, 243 S.W.3d at 614. The Texas Family Code authorizes the appointment of a managing conservator, and it provides that the managing conservator must be a parent, a competent adult, DFPS, or a licensed child-placing agency. TEX. FAM. CODE ANN. § 153.005(a)–(b) (Vernon Supp. 2016); *In re J.A.J.*, 243 S.W.3d at 614. Although rebuttable, the Family Code creates a strong presumption that it is in a child's best interest for his parent to be

---

[20] In determining the best interest of a child, courts may consider the following non-exhaustive factors: (1) the child's desires; (2) the current and future physical and emotional needs of the child; (3) the current and future physical and emotional danger to the child; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the child by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re S.T.*, 508 S.W.3d 482, 490 (Tex. App.—Fort Worth 2015, no pet.); *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

named his managing conservator, and it imposes a heavy burden on a non-parent to rebut this presumption.[21]  TEX. FAM. CODE ANN. § 153.131(a)–(b); *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990); *see also Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("There is a strong presumption that the best interest of a child is served if a natural parent is appointed as managing conservator.").  In order to rebut the presumption and appoint someone other than a parent as the managing conservator of a child, the party seeking appointment as managing conservator must affirmatively prove, and the trial court must find, that the appointment of a parent would "significantly impair the child's physical health or emotional development."  TEX. FAM. CODE ANN. § 153.131(a); *see also In re J.A.J.*, 243 S.W.3d at 616; *Lewelling*, 796 S.W.2d at 167.

Family Code section 263.404 governs a trial court's appointment of DFPS as a child's managing conservator without the termination of parental rights, and it allows the trial court to render a final order appointing DFPS as a child's permanent managing conservator if the court finds that:  (1) a parent's appointment would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development and (2) the appointment of a

---

[21]  "The parental presumption is based upon the natural affection usually flowing between parent and child." *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000).  And "[t]he presumption that the best interest of a child is served by awarding custody to a natural parent is deeply embedded in Texas law." *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990).

relative of the child or another person would not be in the child's best interest. TEX. FAM. CODE ANN. § 263.404(a); *see also In re J.A.J.*, 243 S.W.3d at 614 ("Section 263.404 of the Family Code allows the court to render a final order appointing the Department as the child's conservator without terminating parental rights . . . ."). In deciding whether to appoint DFPS without terminating parental rights, the court must consider the following factors: (1) whether the child will reach eighteen years of age in not less than three years; (2) whether the child is twelve years of age or older and has expressed a strong desire against termination or has continuously expressed a strong desire against being adopted; and (3) the needs and desires of the child. TEX. FAM. CODE ANN. § 263.404(b); *In re J.A.J.*, 243 S.W.3d at 614. As evidence, DFPS must offer "specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *Lewelling*, 796 S.W.2d at 167; *see also In re L.W.*, No. 02-16-00091-CV, 2016 WL 3960600, at *3 (Tex. App.—Fort Worth July 21, 2016, no pet.) (mem. op.) (there must be "some specific, identifiable behavior or conduct of the parent, demonstrated by specific acts or omissions of the parent").

Here, the trial court made the following relevant findings related to permanent managing conservatorship for the children: (1) the appointment of T.H.L. as the managing conservator for the children would not be in the best interest of the children because the appointment "would significantly impair the children's

37

physical health or emotional development"; (2) it would not be in the best interest of the children to appoint a relative of the children or another person as managing conservator; and (3) the appointment of DFPS as sole managing conservator of the children is in their best interest.

In regard to the trial court's first finding, the burden of proof, at trial, was on DFPS, which was required to offer evidence of specific actions or omissions of T.H.L. showing that awarding custody of the children to her would significantly impair the children, either physically or emotionally. *See Lewelling*, 796 S.W.2d at 167; *In re T.R.B.*, 350 S.W.3d 227, 233–34 (Tex. App.—San Antonio 2011, no pet.); *In re W.G.W.*, 812 S.W.2d 409, 413 (Tex. App.—Houston [1st Dist.] 1991, no writ). Usually, a non-parent must present evidence that shows that a parent's conduct would have a detrimental effect on the children. *May v. May*, 829 S.W.2d 373, 376–77 (Tex. App.—Corpus Christi 1992, writ denied); *see also Lewelling*, 796 S.W.2d at 167. And the link between the parent's conduct and harm to the children "may not be based on evidence which raises mere surmise or speculation of possible harm." *May*, 829 S.W.2d at 377.

Generally, acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, narcotic or alcohol abuse, or immoral behavior by a parent. *In re S.T.*, 508 S.W.3d at 492; *In re De La Pena*, 999 S.W.2d 521, 528 (Tex. App.—El Paso 1999, no pet.); *May*, 829

38

S.W.2d at 376–77. "Other considerations may include parental irresponsibility, a history of mental disorders and suicidal thoughts, frequent moves, bad judgment, child abandonment, and an unstable, disorganized, and chaotic lifestyle that has put and will continue to put the child at risk." *In re S.T.*, 508 S.W.3d at 492. While evidence of past misconduct alone may not be sufficient to show present unfitness, "we recognize that a[] [parent]'s future conduct may be somewhat determined by recent past conduct." *In re De La Pena*, 999 S.W.2d at 528. And conduct from two or three years prior plus other evidence of more recent conduct, such as failure to visit a child and inconsistent communication with a child, as well as evidence of the child's bond with his foster parents in a stable environment, in which he was placed because of the parent's acts and omissions, constitutes some evidence to support a finding of significant impairment to a child's physical health or emotional development if the child were placed back in the parent's custody. *In re S.T.*, 508 S.W.3d at 492.

Here, the record reveals that T.H.L. is unable to provide the children with a safe and stable home environment. As several witnesses testified, T.H.L. has a pattern of engaging in relationships with men unsuitable to a healthy family environment and she has an inability to see the harmful effect that her relationships with such men have on her children. *See In re S.T.*, 508 S.W.3d at 492 (considering parental irresponsibility, bad judgment, and lifestyle "that has put and will continue

to put the child at risk"); *F.A.B. v. Dep't of Family & Protective Servs.*, No. 01-10-00930-CV, 2012 WL 5310024, at \*5 (Tex. App.—Houston [1st Dist.] Oct. 25, 2012, no pet.) (mem. op.) ("[T]he record reveals a history of abusive or assaultive conduct by the family or others who ha[ve] access to the [mother's] home."); *see also Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (considering current and future physical and emotional danger to child and parent's acts or omissions in determining best interest). For instance, T.H.L., from 2003 to 2011, was married to R.A.L., the father of R.C. and R.L., and the two still maintain a close relationship. Notably though, their relationship has been plagued with physical violence, "physical altercations," and threatening behavior. On two occasions, T.H.L. stabbed R.A.L. several times, and the children witnessed at least one of the stabbings. During one incident, R.A.L. placed his hand on T.H.L.'s throat, and he threatened her on several other occasions, including in 2009 when he told T.H.L. that "he was going to put her and her mother in an oven."[22] R.A.L. admitted that he has a criminal history and has been incarcerated. And, while this case was pending below, he engaged in a verbal argument with a DFPS supervisor outside the courtroom that later resulted in his arrest for "felony retaliation." T.H.L. "bailed him out" after that arrest. *See In re R.A.*, No. 10-14-00352-CV, 2015 WL 3646528, at \*3 (Tex. App.— Waco June 11, 2015, no pet.) (mem. op.) (trial court did not err in appointing

---

[22] As a result of his action, R.A.L. was convicted of the offense of terroristic threat.

non-parent as child's sole managing conservator where parent had criminal history and pattern of engaging in violent personal relationships which could continue in future); *J.C. v. Tex. Dep't of Family & Protective Servs.*, No. 03-12-00670-CV, 2013 WL 1405892, at \*7 (Tex. App.—Austin Apr. 3, 2013, no pet.) (mem. op.) (considering parent's history of family violence); *see also Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future.").

T.H.L. further admitted that R.A.L. represents a threat to the "health, safety, and welfare" of the children. And R.C. reported that R.A.L. was "very mean" to her, "treat[ed] her like trash," "yell[ed] and scream[ed] at her," and "verbally abuse[d] her." Thus, R.C. does not feel safe around R.A.L.

T.H.L., during the pendency of this case, was also involved with Riggins, who is currently incarcerated for the felony offenses of possession of a controlled substance and "possession of a weapon." Riggins has a significant criminal history, and T.H.L. visited him on five occasions while he was incarcerated. Riggins admitted to engaging in illegal activities during his relationship with T.H.L. and that he had previously been "ordered to register as a sex offender." T.H.L., at the very least, knew that Riggins was "a felon" at the time they were involved, and she

41

admitted that concerns about her involvement with him were legitimate. *See Holley*, 544 S.W.2d at 371–72 (considering acts and omissions by parent in determining best interest); *In re S.T.*, 508 S.W.3d at 492 (considering parental irresponsibility, bad judgment, and lifestyle "that has put and will continue to put the child at risk").

T.H.L. also had a significant relationship with, and was engaged to, D.J., the father of C.J. and C.C.J. Notably, D.J. was murdered in T.H.L's home while the children were present.[23] T.H.L. knew that he had a criminal history, and she stated that he was not the type of person that she would want around her children. Further, on the day of D.J.'s murder, he told T.H.L. that his daughter had been shot at, his son had "killed a drug dealer," he was "in trouble," and that it was "not clear" as to whether the individuals who were after him knew that he lived in T.H.L.'s house. Regardless, T.H.L. chose to leave her house, with D.J. and her children inside, for several hours. It was during this time that D.J. was murdered in her bedroom with C.J. present. When T.H.L. returned home and discovered what had happened, she did not remove C.J. from the room and allowed R.C. to enter the room that contained D.J.'s bloody body. Immediately after the murder, T.H.L. left the children with her mother and left the state, which caused her children distress. There is also evidence of an allegation that D.J., prior to his death, inappropriately touched R.C. or made an inappropriate "verbal sexual comment" toward her. *See Holley*, 544 S.W.2d at

---

[23] D.J. died from "blunt force trauma to the head."

371–72 (considering acts and omissions by parent in determining best interest); *In re S.T.*, 508 S.W.3d at 492 (considering parental irresponsibility, bad judgment, and lifestyle "that has put and will continue to put the child at risk").

Further, the record reveals that T.H.L. is unable to provide satisfactory living conditions for the children. She currently lives in a two-bedroom apartment with her "godmother." And the if children were returned to T.H.L., C.C.J. would sleep in a "toddler bed" in T.H.L.'s bedroom, R.L. and C.J. would sleep on a sofa in the living room near the front door, and R.C. would have to sleep in bed with T.H.L. *See Holley*, 544 S.W.2d at 371–72 (considering current and future physical needs and plans of parent in determining best interest).

DFPS is also concerned about the safety of the children if they are returned to the care of T.H.L., particularly because T.H.L. continues to allow unsafe circumstances in her home. *See In re S.T.*, 508 S.W.3d at 492 (considering parental irresponsibility, bad judgment, and lifestyle "that has put and will continue to put the child at risk"); *F.A.B.*, 2012 WL 5310024, at *5 (noting "record reveals a history of abusive or assaultive conduct by the family or others who had access to the home"); *see also Holley*, 544 S.W.2d at 371–72 (considering current and future physical and emotional danger to child in determining best interest). Wingard, the children's former DFPS caseworker, testified that T.H.L. would be a danger to the children, and she is concerned about T.H.L.'s ability to protect the children and keep

43

them safe. Boutwell, the Child Advocate volunteer for R.C., R.L., and C.J., similarly testified that T.H.L. does not have the judgment necessary to raise the children in a safe environment and is unable to "provide a protective home for the[] children." And King, the Child Advocate volunteer for C.C.J., testified that returning C.C.J. to T.H.L. would endanger the child both physically and emotionally.

Moreover, the trial court heard testimony that T.H.L. is not trustworthy and has engaged in certain dishonest behavior both before and during the pendency of this case that has had a detrimental effect on the children. *See In re S.T.*, 508 S.W.3d at 492 (immoral behavior by parent constitutes significant impairment). T.H.L.'s actions have caused R.C., R.L., C.J., and C.C.J. to be removed from certain foster placements and R.C. to be ultimately placed separately from her brothers. And King testified that T.H.L. has engaged in "[s]chemes of misrepresentation and fraud that w[ere] connected with the children or . . . involved the children," which is dangerous for the children. And the children's therapist does not recommend that the children be returned to T.H.L. *See J.C.*, 2013 WL 1405892, at *6 (trial court did not err in appointing DFPS as children's permanent managing conservator where father unable to provide safe and stable environment for children).

In regard to T.H.L.'s relationship with the children, T.H.L. loves her children and wants them to be returned to her care. *Cf. In re A.C.-D.R.*, No. 02-13-00150-CV, 2013 WL 6198854, at *8 (Tex. App.—Fort Worth Nov. 27, 2013, no pet.) (mem.

44

op.) (not parent's wishes, but child's best interest, "that trumps all other considerations"); *see J.C.*, 2013 WL 1405892, at *7 (trial court did not err in appointing DFPS as children's permanent managing conservator despite evidence father loved children and bonded with them). However, there is evidence that T.H.L. has not acted consistently toward the children during this case, including her visits with the children, and she has not been "a constant" in their lives since DFPS took custody of them. *See In re S.T.*, 2015 WL 9244913, at *8 (considering inconsistent communication with child and failure to visit child as evidence of significant impairment); *In re R.A.*, 2015 WL 3646528, at *4 (noting inconsistency with father's visits).

Wingard further testified that T.H.L. cannot meet the children's needs, and there is evidence that R.C. does not feel safe with T.H.L. and does not "want to go back with her mother."[24] The record reveals that T.H.L. did not tell R.C. that R.A.L. was her biological father until after this case began, and this new information negatively affected R.C.'s well-being. And there is evidence that T.H.L. placed C.C.J. in danger when she attempted to drive her car away from law enforcement officers with the baby in her lap in the front seat. C.C.J. also appears stressed mentally and emotionally after her visits with T.H.L. *See Holley*, 544 S.W.2d at

---

[24] Although R.C. would like to have visits with T.H.L., she would like the visits to be supervised.

371–72 (considering current and future physical and emotional needs and danger in determining best interest). Boutwell, the Child Advocate volunteer for R.C., R.L., and C.J., also testified that C.J. has "no relationship" with T.H.L. and does not know her well. *See In re R.A.*, 2015 WL 3646528, at *4 (noting child's current placement was only home he knew). None of the witnesses has recommended that T.H.L. have unsupervised visits with the children. And several witnesses testified that it is in the best interest of the children that DFPS be named their permanent managing conservator and they not be returned to T.H.L. *See F.A.B.*, 2012 WL 5310024, at *4 (children's guardian ad litem testified not in children's best interest to return to mother).

Additionally, there is a concern that although T.H.L. would like to understand her children, she is not actually capable of understanding what the children have experienced related to D.J.'s murder. And she is unable to "see things through the eyes of the children." T.H.L. has difficulty associating with the children and their needs and does not have the judgment necessary to raise them in a safe environment. Further, T.H.L. admitted to telling R.C. to lie and act dishonestly during this case, and she did not feel that her actions were inappropriate, even though they could have affected R.C. emotionally. *See Holley*, 544 S.W.2d at 371–72 (considering current and future physical and emotional needs and danger and parent's acts or omissions in determining best interest).

46

When DFPS took custody of the children, it was evident that R.C. had taken on a "parenting role" with her younger siblings that was not age appropriate. R.C. was traumatized, hurt, and confused by the events surrounding D.J.'s murder. It was evident that R.C. had suffered emotional harm as a result of entering the bedroom where the murder occurred.[25] And there is concern that returning R.C. to her mother will reverse the progress that she has made while in the care of DFPS.

Finally, the children are doing well in their current placements, and they are happy and healthy. Their respective caregivers want to have them remain in their placements until they reach adulthood.[26] *See* TEX. FAM. CODE ANN. § 263.307(a) (Vernon Supp. 2016) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."). The children's caregivers are meeting their emotional and physical needs and will do so in the future. *See Holley*, 544 S.W.2d at 371–72 (considering child's current and future emotional needs in determining best interest). They avail themselves of programs to assist and promote the best interest of the children, and each child's placement is stable. *See id.* (considering whether programs available to assist parties in determining best interest); *see also* TEX. FAM. CODE ANN. § 263.307. The children's

---

[25] R.C.'s foster mother testified that R.C. had difficulty sleeping and experienced nightmares.

[26] R.C.'s foster mother testified that she wants to maintain a relationship with R.C. even after she has entered adulthood.

caregivers are committed to helping the children excel and supporting their needs. *See Holley*, 544 S.W.2d at 371–72 (considering parental abilities in determining best interest). And all of the children want to remain in their respective placements and have bonded with their caregivers. *See* TEX. FAM. CODE ANN. § 263.404(b); *In re S.T.*, 508 S.W.3d at 492 (considering evidence of child's bond with his foster parents in stable environment); *In re. R.A.*, 2015 WL 3646528, at *4 (emphasizing bond between child and caregiver); *F.A.B.*, 2012 WL 5310024, at *5 (same); *see also Holley*, 544 S.W.2d at 371–72 (considering child's desires in determining best interest)

After considering the evidence in the light most favorable to the judgment, we conclude that the evidence is legally sufficient to support the trial court's findings that the appointment of T.H.L. as the managing conservator for the children would significantly impair the children's physical health or emotional development. And after considering all of the evidence in a neutral light, we conclude that the evidence is factually sufficient to support the trial court's findings that the appointment of T.H.L. as the managing conservator for the children would significantly impair the children's physical health or emotional development. Accordingly, we hold that the trial court did not abuse its discretion in appointing DFPS as the sole managing conservator for the children.

We overrule T.H.L.'s sole issue.

## Conclusion

We affirm the judgments of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Massengale.